**In re LEASE–A–FLEET, INC., Debtor.**

**LEASE–A–FLEET, INC., Plaintiff,**

**Mitsubishi Acceptance Corporation, Defendant and Third–Party Plaintiff,**

v.

**Donald L. WOLK, Steven C. Wolk, Robins Le–Cocq Corp., Third–Party Defendants.**

**Bankruptcy No. 91–12996S. Adv. No. 92–0663S.**

United States Bankruptcy Court, E.D. Pennsylvania.

Feb. 19, 1993.

Patrick Stapleton, Rawle & Henderson; and Michael Needle, Philadelphia, PA, Sp. Counsel for debtor.

Steven B. Kantrowitz, Philadelphia, PA, for defendant.

David Mallenbaum, Robins Le–Cocq Corp., Jenkintown, PA, for third-party defendant Robins Le–Cocq Corp.

Donald L. Wolk, third-party defendant pro se.

Steven C. Wolk, third-party defendant pro se.

Karen Lee Turner, Philadelphia, PA, for Lauderhill.

Robert D. Sayre, Patterson & Weir, Philadelphia, PA, for Meridian Bank.

Frederic Baker, Asst. U.S. Trustee, Philadelphia, PA.

## OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

### A. Introduction

Presently before the court is an adversary proceeding commenced by LEASE–A–FLEET, INC. ("the Debtor") against MITSUBISHI ACCEPTANCE CORPORATION ("MAC") to recover, as preferential transfers, payments totalling $411,000 which were allegedly made to, and for the benefit of, MAC pursuant to a Mutual Release ("the Release") executed by the parties as a settlement of a lawsuit instituted by the Debtor against MAC and Mitsubishi Motor Sales of America ("MMSA") in the District Court of which this court is a unit ("the Litigation").

MAC presents basically two defenses: (1) the prerequisite of 11 U.S.C. § 547(b)(5) (creditor must receive more than in a Chapter 7 liquidation) was not met because it was a secured creditor of the Debtor; (2) the requirements of 11 U.S.C. § 547(b)(2) (payment must be made on account of an "antecedent debt") was not met and the defense set forth in 11 U.S.C. § 547(c)(1) (transaction claimed to be a "contemporaneous exchange for new value") arises because the payments were made pursuant to a settlement agreement. MAC also filed a Third–Party Complaint ("the TP Complaint") against DONALD WOLK ("Donald"), STEVEN WOLK ("Steven"), and ROBINS LE–COCQ CORP. ("Robins"), the guarantors of the settlement agreement (collectively "the Guarantors"), seeking reinstatement of the guarantees in the event that we find that the payments at issue represent voidable transfers.

We find that the transfers at issue are not voidable because the Debtor, which had the burden of proof as to all of the elements of § 547(b), including § 547(b)(5), failed to meet its burden of proving that MAC was an unsecured and undersecured creditor and, as such, received more than it would have under a Chapter 7 liquidation. This disposition renders resolution of the other defenses and the TP Complaint unnecessary, although we express our doubts that MAC's defenses under §§ 547(b)(2) or 547(c)(1) have merit, and our belief that the TP Complaint would also have merit, but for our resolution of the claim in favor of MAC.

### B. Factual and Procedural History

This matter arises in connection with a voluntary Chapter 11 bankruptcy proceeding filed by the Debtor on May 30, 1991. As we noted in our *fifth* and most recent published Opinion arising out of this case, *In re Lease–A–Fleet, Inc.*, 148 B.R. 419, 421 (Bankr.E.D.Pa.1992) (*"LAF V"*),

[t]o describe this bankruptcy case as over-litigated would be an understatement. The protagonists of most of the litigation are, on one hand, the Wolk family, the owners of the Debtor; and [MORSE OPERATIONS, INC. d/b/a LAUDERHILL LEASING ("Lauderhill")] on the other. The Debtor was formerly an intermediate lessee of vehicles supplied by Lauderhill and a lessor of these vehicles in turn to small companies mostly located in Florida renting directly to consumers.

This proceeding involves transactions in which the Debtor acquired vehicles prior to its ill-fated decision to acquire all of its vehicles from Lauderhill in 1990 and 1991. Lauderhill supported the Debtor in this proceeding. Ironically, the combined force of these experienced litigators working, per-

haps for the first time, in concert turns out to be insufficient to carry the day for the Debtor.

A detailed history of this case can be gleaned from review of *LAF V, id.*, 148 B.R. at 420 (denial of administrative claims of Robins and another entity affiliated with the debtor), and our other previous decisions arising out of this case. *See In re Lease–A–Fleet, Inc.*, 131 B.R. 945 (Bankr. E.D.Pa.1991), *aff'd in part & rev'd in part*, 141 B.R. 63 (E.D.Pa.), *aff'd*, 983 F.2d 1051 (3rd Cir.1992) (*"LAF I"*), (allocation of certain post-petition payments received by the Debtor among the Debtor itself, Lauderhill, and its two secured creditors); *In re Lease–A–Fleet, Inc.*, 140 B.R. 840 (Bankr.E.D.Pa.1992) (*"LAF II"*) (administrative claim of Lauderhill denied in part and conditionally granted in part); *In re Lease–A–Fleet, Inc.*, 141 B.R. 853 (Bankr. E.D.Pa.1992) (*"LAF III"*) (judgment entered in favor of the Debtor in a preference action against Lauderhill in the amount of $850,055.53); *In re Lease–A–Fleet, Inc.*, 141 B.R. 869 (Bankr.E.D.Pa.1992) (*"LAF IV"*) (Lauderhill's Complaint seeking to "substantively consolidate" Robins into the Debtor's bankruptcy case dismissed).

The present action was commenced by the Debtor on July 7, 1992. Initially, the Debtor sought to recover, as a preferential transfer, only the $211,000 ($110,000 and $100,000) payment which it made directly to MAC. On October 22, 1992, the Debtor was granted leave to amend its Complaint to add a claim for a $200,000 payment made to MAC by MMSA on the Debtor's behalf pursuant to the terms of the Release. MAC filed an Answer to both the original and amended complaints denying that the payments were preferential transfers. Specifically, in its Third Affirmative Defense, MAC averred that it was a secured creditor, precluding avoidance of the payments to it as preferential. On August 7, 1992, MAC also filed the TP Complaint against the Guarantors, requesting that, if any of the payments in issue were declared preferential transfers, the guarantees

should be reinstated pursuant to the terms of the Release.

The trial of this matter was conducted on January 13, 1993, on a must-be-tried basis, after five continuances due to the aforementioned procedural gyrations. At the trial, the Debtor offered the testimony of Steven; Michael B. Needle, Esquire, its special counsel ("Needle"); P.J. Stapleton, III, Esquire, a partner in Rawle & Henderson ("R & H"), the Debtor's general counsel ("Stapleton"); and Joshua Bachrach, a paralegal employed by R & H ("Bachrach").

The testimony elicited from the witnesses and the documents introduced into evidence by the Debtor set forth the events leading to the execution of the Release and the alleged preferential transfers pursuant thereto. Steven testified that, in 1988, the Debtor entered into a purchase and buy-back agreement with MMSA, through a New Jersey Mitsubishi dealership, whereby it would receive 200 automobiles which would be sub-leased to one of its customers, Lindo's Rental Car Co. ("Lindo"). The purchase of these vehicles was financed by MAC under an agreement which required LAF to make monthly payments to MAC and a balloon payment at the end of a designated time-period, which was contemplated to coincide with the repurchase of the vehicles by MMSA. MMSA re-purchased, and MAC was paid for, all of the vehicles with the exception of nine (9) vehicles which MMSA refused to re-purchase because of certain damages, and the Debtor was therefore forced to retain.

In 1989, the Debtor entered into a second purchase and buy-back agreement ("the 1989 Agreement"), directly with MMSA, for 400 motor vehicles, with delivery of the vehicles to be made to Lindo in Los Angeles, California. The sale was again financed by MAC, with monthly payments and a balloon payment to be made by the Debtor, the latter again projected to coincide with the repurchase of the vehicles by MMSA from the Debtor. As a result of financial difficulties encountered by Lindo, the vehicles were returned earlier than the eight-month maximum provided for in the

1989 Agreement. Thereafter, a dispute developed between the Debtor and MMSA regarding the amounts due under the 1989 Agreement.

Needle testified that he had been retained by the Debtor in connection with the dispute between it and MMSA regarding the amounts due under the re-purchase segment of the 1989 Agreement. MMSA contended that it was not required to tender re-purchase payments until it received the titles to the vehicles. The Debtor asserted that payments for the re-purchases of the vehicles did not depend upon the tender of titles, but instead was triggered by the return of the vehicles and acceptance of same by MMSA. As a consequence of this disagreement, the Debtor withheld the balloon payments due from the Debtor to MAC under the 1989 Agreement.

The parties were unable to resolve these disputes and the Debtor commenced the Litigation, naming both MMSA and MAC as defendants, on or about August 31, 1990. The Debtor's primary allegation against MAC was that it had failed to obtain and to submit, in timely fashion, the titles to the vehicles in question to it. MAC filed a counterclaim against the Debtor, demanding payment of the amounts due for the nine unreturned 1988 vehicles and the balloon payments due under these parties' 1989 financing agreement. On or about May 3, 1991, 27 days prior to the Debtor's bankruptcy filing, following intensive negotiations, the parties executed the Release in settlement of the Litigation. The Release, which was submitted into evidence by the Debtor, provided that, in resolution of their dispute, the Debtor paid $211,000 directly to MAC and MMSA paid $200,000 to MAC on the Debtor's behalf. In exchange, all parties withdrew their claims and agreed to refrain from bringing any future actions against the other arising out of this matter. In addition, MAC was to turn over titles to the "1988 and 1989 vehicles" to the Debtor and provide the Debtor with a credit-reference letter. The Debtor's payments under the terms of the Release were made and are the subject of this litigation.

The Debtor then proffered certain testimony on the issue of MAC's security interests in the vehicles. Bachrach testified that he conducted a search for Uniform Commercial Code ("UCC") filings by any party against the Debtor in Montgomery County, Pennsylvania. No filings by MAC in connection with the 1989 Agreement were located. MAC stipulated that the documents obtained by Bachrach in his search were correct.

Stapleton's testimony was offered to establish the Debtor's allegedly insolvent financial condition at the time of the transfers, and to relate the payments that would be made to creditors under a Chapter 7 liquidation. He opined that the monies currently possessed by the Debtor, together with the amounts expected to be collected from outstanding accounts receivables and certain district court litigation against Lauderhill, see *LAF V*, 148 B.R. at 422, would be insufficient to pay unsecured creditors in full under a Chapter 7 liquidation.

Following Stapleton's testimony, the Debtor closed its case. MAC then moved for entry of a directed verdict in its favor, asserting that the Debtor had failed to meet its burden of proving the elements of §§ 547(b)(2) and 547(b)(5). We denied this motion at that juncture and MAC presented its defense.

MAC offered only the testimony of Gary Jotblad, its vice-president of finance and administration ("Jotblad"). Jotblad testified that, at the time that the Release was executed by the parties, MAC's claim against the Debtor was $473,000. Without elaboration, he stated that MAC held titles which secured the vehicles. He also stated that MAC obtained title to the vehicles in stages and eventually obtained possession of the titles for all vehicles involved in the 1988 and 1989 transactions. He did not, however, indicate when the titles to the vehicles were released by MAC, if at all, to the Debtor or MMSA.

Upon the conclusion of Jotblad's testimony, the Debtor requested and was granted

permission to re-open its case on the ground that it was "surprised" by MAC's assertion that it held security interests in the vehicles by virtue of liens upon their titles. The Debtor then recalled Steven, who testified that only following its payment of the $211,000 required by the terms of the Release had the Debtor received from MAC titles to twelve (12) of the vehicles purchased from MMSA. He stated that these twelve (12) vehicles, which were allegedly damaged and MMSA refused to accept, were subsequently sold to wholesalers for approximately $2,500 each.

In closing arguments, the parties agreed that the only matters at issue were whether the Debtor met its burden as to § 547(b)(2) (whether the payments were on account of an antecedent debt); § 547(b)(5) (whether the creditor received more than it would have under a Chapter 7 liquidation of the Debtor); and, assuming *arguendo* that the Debtor met its burdens of proving all elements of § 547(b), whether MAC met its burden of proving the elements of § 547(c)(1) (whether the transaction was a contemporaneous exchange for new value). MAC filed a Trial Brief, and, after a post-trial argument, was allowed until January 20, 1993, to file a Supplemental Brief. All interested parties were allowed until January 27, 1993, to file a Reply Brief, which date was extended by agreement to January 29, 1993, for the Debtor to file its Reply Brief. In addition to the Debtor, the Guarantors, in defense of the TR Complaint only, filed a responsive Brief.

### C. Discussion

1. THE DEBTOR CLEARLY HAD THE BURDEN OF PROVING ALL ELEMENTS UNDER SECTION 547(b), INCLUDING MAC'S LACK OF A SECURITY INTEREST IN THE AMOUNT PAID ON ITS BEHALF, IN ORDER TO PREVAIL IN THIS LITIGATION.

■ The sections of the Bankruptcy Code in issue, 11 U.S.C. §§ 547(b)(2), (b)(5), (c)(1), provide as follows:

(b) Except as provided in subsection (c) of this section, the trustee may avoid any transfer of an interest of the debtor in property—

· · · · ·

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

· · · · ·

(5) that enables such creditor to receive more than such creditor would receive if—

(A) the case were a case under chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

· · · · ·

(c) The trustee may not avoid under this section a transfer—

(1) to the extent that such transfer was—

(A) intended by the debtor and the creditor to or for whose benefit such transfer was made to be a contemporaneous exchange for new value given to the debtor; and

(B) in fact a substantially contemporaneous exchange; · . . .

As is often the case when the record includes gaps in proof of relevant facts, the crucial § 547(b)(5) issue must be resolved by determining which party has the burden of proving the "missing" elements. The issue of the parties' relative burdens of proof in a preference action is specifically addressed in 11 U.S.C. §§ 547(f), (g) as follows:

(f) For the purposes of this section, the debtor is presumed to have been insolvent on and during the 90 days immediately preceding the date of the filing of the petition.

(g) For the purposes of this section, the trustee has the burden of proving the avoidability of a transfer under subsection (b) of this section, and the creditor or party in interest against whom recovery or avoidance is sought has the burden of

proving the nonavoidability of a transfer under subsection (c) of this section.

It appears quite clear, from perusal of 11 U.S.C. § 547(g), that, in order to recover or avoid a payment as preferential, the plaintiff-trustee or debtor-in-possession must prove *every element* of § 547(b). *See, e.g., Decatur Contracting v. Belin, Belin & Naddeo*, 898 F.2d 339, 345 n. 5 (3rd Cir. 1990); and *In re Keystone Foods, Inc.*, 145 B.R. 502, 508 (Bankr.W:D.Pa.1992). Therefore, the threshold determination of whether the payments in issue are avoidable preferences requires us to decide whether the trustee or debtor-in-possession has proven *all* of the elements required by § 547(b).

There is no doubt that the Debtor bore the burden of proving the element of 11 U.S.C. § 547(b)(5), *i.e.*, that MAC received more from the payments received under the Release than it would have were this case a Chapter 7 case and it were compelled to accept the distribution due to it in such a case. *See, e.g., LAF III, supra*, 141 B.R. at 861; and *In re E & S Comfort, Inc.*, 92 B.R. 616, 619–20 (Bankr.E.D.Pa. 1988).

While the Debtor, in its Brief, acknowledges this burden in one breath, it attempts to escape from this burden in another breath by making two arguments: (1) MAC allegedly failed to indicate, in its responses to written interrogatories asked of it in pretrial discovery by the Debtor, that it claimed security interests in the 1988 and 1989 vehicles by virtue of liens on the vehicles' titles, which the Debtor argues should now preclude MAC from asserting. such a position and absolve it from proving that MAC was an unsecured or undersecured creditor which was paid more than it would receive in a Chapter 7 case; and (2) it is unfair to place the burden of proving the lack of MAC's security interests in the vehicles upon the Debtor, because, in many other contexts under the Code, a secured party bears the burden of proving the existence of its own security· interests. The Debtor cites but one case in support of this principle, *In re Furniture Shop, Inc.*, 28 B.R. 266 (Bankr.N.D.Ohio 1983).

■ Regarding the first argument, we observe that MAC's answers to interrogatories were not made a part of this record and therefore cannot be considered by us in rendering our decision. *See* Federal Rule of Civil Procedure ("F.R.Civ.P.") 33(b), incorporated by reference in Federal Rule of Bankruptcy Procedure 7033 (answers to interrogatories "may be used" at trial, but only "to the extent permitted by the rules of evidence"); *Bracey v. Grenoble*, 494 F.2d 566, 570 n. 7 (3rd Cir.1974) (" 'answers to interrogatories do not become evidence in the case, unless voluntarily introduced ...,' "), quoting *Heilig v. Studebaker Corp.*, 347 F.2d 686, 689 (10th Cir.1965); and 4A J. MOORE, FEDERAL PRACTICE, ¶ 33.29 [1.–2], at 33–173 to 33–177 (2nd ed. 1992).

■ Moreover, it is improper for the Debtor to refer to MAC's answers to interrogatories as if they *were* part of the record. *Compare LAF I, supra*, 131 B.R. at 951; and *In re Mirkin*, 100 B.R. 221, 226 n. 4 (Bankr.E.D.Pa.1989) (it is inappropriate to attach copies of, and argue from, documents not admitted into evidence at trial in post-trial briefs).

■ If the Debtor wanted to introduce the answers to interrogatories at trial, it should have attempted to obtain their admittance under F.R.Civ.P. 33(b). At this point, admittance would be possible only if the Debtor successfully moved to re-open the record to do so. *See LAF I, supra*, 131 B.R. at 951. *But cf. In re Pinto*, 89 B.R. 486, 502 (Bankr.E.D.Pa.1988), *modified*, 98 B.R. 200 (Bankr.E.D.Pa.), *rev'd*, C.A. No. 89–3233, 1989 WL 234516 (E.D.Pa. Aug. 18, 1989), citing 6A J. MOORE, ¶ 59.04[13], at 59–36 to 59–37 (2d ed. 1988) (motions to reopen a record are viewed with disfavor if they are not made until after a court has rendered a decision; as a case in point, the district court reversed our reopening of the *Pinto* record, and directed that we reinstate our original decision in favor of the defendants, even though, in light of the additional evidence presented, we ultimately rendered a decision in favor of the plaintiffs).

Regarding the second argument, this court acknowledges that, in deciding a matter under a Code section other than § 547, like the decision under § 363 at issue in *Furniture Shop, supra,* 28 B.R. at 268, a secured creditor may well be obliged to prove the validity of its alleged security interests to be entitled to relief. *Compare In re Grant Broadcasting of Philadelphia, Inc.,* 75 B.R. 819, 822–23 (E.D.Pa. 1987) (alleged secured party bears the burden of proving the validity of its security interests in matters arising under 11 U.S.C. §§ 362 and 363).

However, § 547 is a self-contained Code section which provides its own specific designations of the burdens of proof of the respective parties in 11 U.S.C. §§ 547(f), (g), quoted at pages 346–47 *supra.* Moreover, it is not surprising that the burdens on a party seeking to avoid or undo a transaction which was perfectly legal and proper at the time that it was effected should be greater than the burdens on a debtor fighting for its economic life in seeking permission to use a secured creditor's cash collateral and/or trying to withstand a secured creditor's foreclosure of its assets.

■ The Code, at §§ 547(b)(5), (g), requires the plaintiff in a preference action to prove that the defendant was paid more than it would have received in a Chapter 7 liquidation. This requirement obliges the plaintiff to prove, when the issue is clearly raised, as it was by MAC in its Answer and proof at trial here, that the defendant is either an unsecured or an undersecured creditor. *See e.g., In re Rimmer Corp.,* 80 B.R. 337, 339 (Bankr.E.D.Pa.1987) ("a payment to a secured creditor is not preferential"). *Accord, In re Erin Food Services, Inc.,* 980 F.2d 792, 803 (1st Cir.1992). It is therefore an unfortunate fact of life that a preference plaintiff must effectively prove a negative (that the defendant is *not* a totally secured creditor), even though the secured creditor is the party with most access to proof of the validity of its own security interests. *Compare In re Fricker,* 116 B.R. 431, 437–38 (Bankr.E.D.Pa. 1990) (burden of proof usually lies with the party with the most access to proof on that

issue). The statute, despite these considerations, places the burden upon the plaintiff. And its dictates must be followed.

Although not cited by either party, the case which most clearly portrays the extent of the burden of proving the element of § 547(b)(5) on the instant Debtor is *Mellon Bank, N.A. v. Metro Communications, Inc.,* 945 F.2d 635, 641–44 (3rd Cir.1991), *cert. denied sub nom., Committee of Unsecured Creditors v. Mellon Bank, N.A.,* —— U.S. ——, 112 S.Ct. 1476, 117 L.Ed.2d 620 (1992). In that case, the defendant-creditor, Mellon Bank, N.A. ("Mellon") brought an adversary proceeding to determine the extent and validity of its security interest in the debtor's property. *Id.* at 639. The official unsecured creditors' committee of the debtor intervened, seeking to avoid Mellon's claims on the grounds that its interests were preferential and/or were avoidable as fraudulent conveyances. *Id.* The bankruptcy court held that, since Mellon had asserted in its adversary complaint that it was a secured creditor, it maintained the burden of proving, under § 547(b), that it had a valid security interest in the debtor's property. *Id.* at 642. The bankruptcy court concluded that Mellon's security interests were avoidable as preferences because Mellon had failed to meet its burden of proof under § 547(b)(5). *Id.* The district court affirmed the bankruptcy court's decision. *Id.* at 640.

In reversing both lower court decisions, the court held, *id.* at 642, that

[t]he bankruptcy court erred in holding that Mellon had to prove that its security interest was not a voidable preference under section 547 in order to establish its secured status. This ruling is in direct contravention with the allocation of the burden of proof statutorily provided for in section 547(g) which states that *"the trustee has the burden of proving the avoidability of a transfer under subsection (b) of this section.* (citations omitted.) The bankruptcy court's erroneous legal conclusion that Mellon had the burden of proof to sustain the validity of its security interest under section 547 mate-

rially permeated its factual findings (emphasis in original).

*Accord, In re Foland & Co.*, 55 B.R. 593, 595 (Bankr.E.D.Pa.1985) (preference plaintiff is unsuccessful because it failed to present evidence that the defendant had not perfected its alleged security interest).

The decision in *Mellon Bank, supra*, must be applied to the facts of the instant case. The Debtor, as the party seeking the avoidance of the transfer effected by the payments, clearly has the burden of proving all the elements required under § 547, including that of § 547(b)(5). The burden of proof cannot be shifted to MAC simply because it has asserted, but not proven, a security interest in the Debtor's property.

## 2. THE DEBTOR FAILED TO PROVE THAT MAC WAS PAID MORE IN THE INSTANT TRANSFERS THAN IT WOULD HAVE RECEIVED IN A CHAPTER 7 LIQUIDATION.

In the instant matter, the parties have agreed that the only elements of § 547(b) which were in dispute are those set forth in §§ 547(b)(2) and (b)(5), quoted at page 346 *supra*. As the foregoing discussion portends, we are prepared to rule in favor of MAC on the ground that the Debtor failed to meet its burden of proof under § 547(b)(5). Only a brief discussion of § 547(b)(2), together with a discussion of MAC's § 547(c)(1) defense, follows at pages 351–53 *infra*.

■ A conclusion that the payments to MAC constituted a voidable preference under § 547(b) would require us to find that the Debtor, by a preponderance of evidence, *see In re Aspen Data Graphics, Inc.*, 109 B.R. 677, 681 (Bankr.E.D.Pa. 1990), proved the requirement of § 547(b)(5), *i.e.*, that MAC received more than it would have netted in a Chapter 7 liquidation. Such a finding required the Debtor to show that either (1) MAC was an unsecured creditor and that unsecured creditors would have received less than one hundred (100%) percent payment under a Chapter 7 liquidation; or (2) MAC was an undersecured creditor and the payments received exceeded the value of its collater-

al. *See Rimmer, supra*, 80 B.R. at 339–40. The testimony and evidence presented by the Debtor at trial failed to prove either of these facts.

■ At trial, the Debtor initially attempted to prove that MAC was not a secured creditor by presenting Bachrach's testimony regarding MAC's failure to file UCC–1 statements with either or both of the Secretary of the Commonwealth of Pennsylvania and/or the Prothonotary of Montgomery County. The Debtor argues that, because of this initial showing, MAC was required to prove that it effectuated filings pursuant to 13 Pa.C.S.A. § 9103(c), which provides as follows:

(c) Accounts, general intangibles and mobile goods.—

(1) This subsection applies to accounts (other than an account described in subsection (e) relating to minerals) and general intangibles and to goods which are mobile and which are of a type normally used in more than one jurisdiction, such a motor vehicles, trailers, rolling stock, airplanes, shipping containers, road building and construction machinery and commercial harvesting machinery and the like, if the goods are equipment or inventory leased or held for lease by the debtor to others *and are not covered by a certificate of title described in subsection (b)*.

(2) The law (including the conflict of laws rules) of the jurisdiction in which the debtor is located governs the perfection and the effect of perfection or nonperfection of the security interest (emphasis added).

While the Debtor is correct in its argument that § 9103(c) generally requires the filing of UCC–1's to perfect interests in leased motor vehicles, it ignores the limiting clause in this section that it applies only to motor vehicles held for lease by a debtor which *are not covered by certificates of title*. Consequently, the Debtor was obligated to prove that the vehicles at issue were not covered by certificates of title and, as such, that any security interests asserted by MAC were governed exclusively by the provisions of § 9103(c).

However, the Debtor did not address the issue of whether or not the vehicles were covered by certificates of title and hence were subject to or exempt from the provision of § 9103(c). Instead, the Debtor argued that, to the extent that MAC had a security interest in the vehicles by virtue of liens on the titles, such interests ceased to exist upon the surrender of the titles to MMSA. In support of its argument, the Debtor relied upon Pennsylvania law, 13 Pa.C.S.A. § 9103(b), and identical California law (the state where the vehicles were located at all times relevant to this action), CAL.COMM.CODE, § 9103(2), which both state as follows:

Perfection and the effect of perfection or non-perfection of the security interests are governed by the law (including the conflict of laws rules) of the jurisdiction issuing the certificate until four months after the goods are removed from that jurisdiction and thereafter until the goods are registered in any other jurisdiction, but in any event not beyond surrender of the certificate.

Unfortunately for the Debtor, the proof which it submitted was insufficient to establish, by the requisite preponderance of the evidence, that the titles were surrendered by MAC to the Debtor, to MMSA, or to any other entity prior to the date of the alleged preferential payments. The evidence presented at trial, particularly the Release and the July 3, 1990, letter of David Mallenbaum, Esquire ("Mallenbaum"), counsel for the Guarantors, to Phillip J. Mazzoni, MAC's Eastern Region Operations Manager, indicates that MAC retained titles to *at least* 145 of the 400 vehicles. This evidence does not establish, however, that MAC failed to retain titles to the remaining 255 vehicles. Furthermore, while the Debtor asserts that titles to all 400 vehicles were tendered by MAC to MMSA to by December, 1989, or January, 1990, the evidence does not support this conclusion. Rather, the evidence only establishes that, as of December, 1989, or January, 1990, the Debtor *had returned* all of the 1989 vehicles to MMSA. However, as was pointed out in Mallenbaum's own correspondence regarding payment for the returned 1989 vehicles of July 3, 1990 (referenced *supra*), and of June 12, 1990, to Jerry Thompson, MMSA's Manager of Administrative Operations, return of the vehicles and tender of title were two independent and separate things. Consequently, return of the vehicles to MMSA by the Debtor did *not* prove that MAC tendered the corresponding titles to the Debtor, or to MMSA, or to any other party.

The foregoing evidence does not permit us to reach any conclusive decision on the issue of whether or not MAC retained certificates of titles of the vehicles subject to the 1989 Agreement at all pertinent times. However, since the Debtor bore the burden of proving that MAC did *not* retain the certificates, the Debtor was unable to prove that MAC's claim was unsecured.

The Debtor's failure to prove that MAC was an unsecured creditor was not necessarily fatal to its claim that all of the payments to MAC were voidable as preferences. The Debtor could still possibly avoid some of the payments by proving that MAC was an undersecured creditor and hence received *more* than it would have in a Chapter 7 distribution. However, we find that the Debtor failed to offer sufficient proof upon which this court could find that any of the payments were avoidable as preferences.

In support of its claim that MAC was not at least partially unsecured, the Debtor pointed to the testimony of Steven, after it reopened its case, that, following the Debtor's payments of the $211,000 required by the Release, MAC delivered the titles to twelve (12) vehicles to the Debtor, which were then sold by the Debtor for approximately $2,500 each. The Debtor contended that, since Steven did not say anything about MAC's delivery of the titles for any of the other vehicles, this testimony was sufficient to prove that MAC only retained liens upon, at most, twelve (12) vehicles, and that the $411,000 payments exceeded the value of MAC's collateral.

The Debtor's position is not supported by logic or the record. The letters submitted by the Debtor in connection with the par-

ties' negotiations prior to the Litigation between the indicate that the Debtor retained possession of at least nine (9) of the 1988 vehicles. It is clear from these letters that the titles tendered by MAC related to *these* vehicles. However, as to the crucial 1989 vehicles, there is absolutely no evidence in the record regarding the delivery of titles or releases of its liens on the vehicles to the Debtor or to MMSA by MAC. The self-serving statements in these letters are, in our view, clearly insufficient to prove, by a preponderance of the evidence, that, at the time of the alleged preferential payments, MAC retained security interests in *only* twelve (12) vehicles. The fact that twelve (12) titles were admittedly delivered proves nothing about the titles to the other vehicles, concerning which no evidence was presented.

Similarly, in assessing whether the payments made to MAC were greater than the value of its collateral, the evidence is insufficient to permit the court to reach such a conclusion. The only evidence before the court is the value of twelve (12) vehicles, which, according to the testimony of Steven, were sold to wholesalers at "discounts." No evidence was offered by the Debtor which addressed the issue of the value of the other vehicles covered by the 1989 Agreement. Furthermore, Needle's testimony indicated that the sums to be paid by MMSA to the Debtor to re-purchase the 1989 vehicles were designed to be substantially equal to the balloon payment due to MAC from the Debtor. While the balloon payment to MAC was to occur in late 1989 or early 1990 and the values of the 1989 vehicles must be assessed as of that time period, the Debtor presented no evidence regarding the values of the vehicles at the time of the alleged preferential payments. Therefore, on the basis of the evidence before it, this court is unable to hold that MAC was an undersecured creditor which received more than it would have under a Chapter 7 liquidation.

We therefore conclude that the Debtor failed to meet its burden of proving that MAC was either an unsecured or undersecured creditor which received more through the alleged preferential payments to it than it would have in a distribution in a Chapter 7 case. Consequently, the Debtor has not met its requisite burden of proving the element set forth in § 547(b)(5) by a preponderance of the evidence.

3. IT DOES NOT APPEAR THAT THE OTHER DEFENSES ASSERTED BY MAC UNDER §§ 547(b)(2) AND 547(c)(1) HAVE MERIT, ALTHOUGH ITS THIRD–PARTY COMPLAINT WOULD APPEAR TO HAVE ENTITLED IT TO RELIEF AGAINST THE GUARANTORS HAD THE PAYMENTS IN ISSUE BEEN ADJUDICATED PREFERENTIAL TRANSFERS.

Our determination that the Debtor failed to satisfy the requirement set forth in § 547(b)(5) requires, in itself, that we enter judgment in favor of MAC. However, we will briefly discuss the reasons why we believe that MAC's other defenses lack merit and that the § 547(b)(5) issue is not only sufficient, but also necessary, to carry the day for MAC.

MAC argues that the payments which it received from the Debtor and MMSA were not made on account of an antecedent debt of the Debtor to it, as required by § 547(b)(2), but rather that the payments represented a contemporaneous exchanges for new value, which constitutes an affirmative defense under 11 U.S.C. § 547(c)(1). In support of its position on these issues, MAC relies principally upon *Lewis v. Diethorn*, 893 F.2d 648 (3rd Cir.), *cert. denied*, 498 U.S. 950, 111 S.Ct. 369, 112 L.Ed.2d 332 (1990). Therein, the court held that a prepetition payment by a debtor to settle a lawsuit in exchange for an agreement of the defendants to remove a *lis pendens* against the plaintiff's property and to drop all counterclaims against the plaintiff did not constitute a preferential transfer subject to avoidance under § 547 because the payment was found to be in exchange for freedom from litigation instead of a mere payment on an antecedent debt, and therefore represented a contemporaneous exchange for new value. *Id.* at 650. *See also Nelson Co. v. Amquip*

*Corp.,* 128 B.R. 930, 935 (E.D.Pa.1991), *aff'd,* 959 F.2d 1260 (3rd Cir.1992).

MAC contends that the settlement of the instant Litigation was not on account of an antecedent debt, but was rather a contemporaneous exchange because, like the debtors in *Lewis,* and *Nelson,* the instant Debtor received both the freedom from the risk of litigation and a benefit by paying $411,-000, to, and on account of, MAC to liquidate a debt to MAC in he amount of $473,-000.

We doubt that *Lewis* stands for the principle that, merely because a payment is made by a debtor in settlement of litigation, a payment on an antecedent debt is necessarily transformed into a contemporaneous exchange. There is no question that a debtor's payment on an antecedent debt where there has been no litigation with the creditor paid is within the scope of § 547(b)(2). There is also little doubt that a debtor's payment of an antecedent debt in satisfaction of a creditor's judgment obtained through litigation would be within the scope of § 547(b)(2). It thus seems nonsensical to argue, as does MAC, that merely because the parties settled litigation, and this settlement resulted in payments to the creditor, the settlement creates a new obligation for which the payment may be deemed outside of the scope of § 547(b)(2) and as a "a contemporaneous exchange for new value" under § 547(c)(1). Rather, the *Lewis* and *Nelson* decisions appear driven by the respective courts' conclusion that what the parties exchanged in the respective settlements was substantially equivalent. *Cf. In re Pinto Trucking Service, Inc.,* 93 B.R. 379, 388–90 (Bankr. E.D.Pa.1988) (where debtor gives up rights which are reasonably equivalent to the property transferred by the debtor, the transfer cannot be avoided as a fraudulent conveyance).

The debtors in *Lewis* and *Nelson* were not prepared to "give back" the benefits which they received in exchange for the payments made to them. On the other hand, the instant Debtor did not receive anything of value in the Release which it would hesitate to "give back" to MAC. If the transfers were avoided, MAC would recover only its $473,000 proof of claim against the Debtor and, apparently, the Guarantors.[1]

MAC could prevail in a defense under § 547(c)(1) only if it met its burden of proving, *see* 11 U.S.C. § 547(g) (defendant has the burden of proving any affirmative defense under § 547(c)), that both parties (the Debtor and MAC) intended the transfer to be a contemporaneous exchange for value and that it actually *was* a contemporaneous exchange. *See In re Spada,* 903 F.2d 971, 974–77 (3rd Cir.1990); and *In re Samar Fashions, Inc.,* 109 B.R. 136, 139 (Bankr. E.D.Pa.1990). If the parties were restored to the *status quo* which existed before the execution of the Release, MAC would be placed back into the position of an unsecured creditor owed $473,000 for at least a year prior to the date on which the payments in issue were made. It is difficult for us to see how MAC's change from the status of a large, long-standing unsecured creditor to that of a recipient of $411,000 in payments can be considered as rendering it the recipient of what is actually a *"contemporaneous* exchange for *new* value."

We also note that, in *LAF III, supra,* 141 B.R. at 862–63, we discussed the issue of what constitutes an "antecedent debt" pursuant to § 547(b)(2). There, the Debtor sought to avoid certain periodic payments made to Lauderhill as preferential transfers. Lauderhill countered with an argument that the payments were not preferential because they were not made on account of an antecedent debt, but were rather prepayments of the Debtor's monthly lease obligations. We rejected Lauderhill's contentions, stating that

---

1. We do not see how the Guarantors can equitably argue that their guarantees could not be restored if the transfers pursuant to the Release were avoided. We can say this: if these guarantees would *not* be restored, then it appears to us that the benefits would have been received as a result of the transfer which could *not* be "given back" to MAC. In that case, it appears that the reasoning of *Lewis* and *Nelson would* bar avoidance of the payment transfers under §§ 547(b)(2) and 547(c)(1).

a debt is "incurred" at the earliest of the date when services are provided or when the parties' contract or independent agreement calls for payment. *In re American Int'l Airways, Inc.*, 68 B.R. 326, 332 (Bankr.E.D.Pa.1986), *aff'd,* C.A. No. 87–1287, 1987 WL 54484 (E.D.Pa. May 12, 1987).... The debt arising from the Debtor's April 1991, obligation was therefore incurred as of the date that the Debtor agreed to pay it.

*Accord, In re Wey*, 854 F.2d 196, 200 (7th Cir.1988).

Here, the evidence presented at trial reveals that the Debtor became obligated to pay MAC under the terms and conditions of the parties' 1988 and 1989 financing agreements long prior to the dates of the Litigation, the execution of the Release, *and* the payments to MAC in accordance with the terms of the Release. The payments made to MAC were thus "incurred as of the date the Debtor agreed to pay," in 1988 and 1989. Accordingly, the Debtor's payments made to MAC in 1991 appear to be on account of antecedent debts incurred in 1988 and 1989.

### D. Conclusion

For all of the reasons stated above, we will enter an Order rendering judgment in favor of MAC as to all claims by the Debtor, and entering judgment in favor of the Guarantors on the TP Complaint on the ground that the decision in favor of MAC on the claims in the main Amended Complaint renders the claims set forth in the TP Complaint moot.