**In re LEASE–A–FLEET, INC., Debtor.**

**LEASE–A–FLEET, INC., Plaintiff,**

v.

**UNIVERSITY CADILLAC, INC., Morse Operations, Inc. and Meridian Bank, N.A., Defendants.**

**Bankruptcy No. 91–12996S.**
**Adv. No. 92–1269S.**

United States Bankruptcy Court, E.D. Pennsylvania.

March 2, 1993.

Michael R. Needle, Needle & Feldman, Philadelphia, PA, Sp. Counsel for plaintiff-debtor.

Patrick J. Stapleton, Rawle & Henderson, Philadelphia, PA, General Counsel for debtor.

Karen Lee Turner, Dilworth, Paxson, Kalish & Kauffman, Philadelphia, PA, for defendants University Cadillac, Inc. and Morse Operations, Inc.

Robert D. Sayre, Patterson & Weir, Philadelphia, PA, for Meridian Bank, N.A.

Frederic Baker, Asst. U.S. Trustee, Philadelphia, PA.

## OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

### A. INTRODUCTION

Before this court for determination is the issue of whether monies collected post-petition by LEASE-A-FLEET, INC. ("the Debtor") from the sub-lessees of its motor-vehicle fleet, leased from Defendant MORSE OPERATIONS, INC. (which trades as Lauderhill Leasing and is referenced as "Lauderhill"), are (1) after-acquired property exempt from the broad pre-petition liens of the Debtor's secured creditors, Defendants UNIVERSITY CADILLAC INC. ("UCI"), assignee of United Valley Bank ("UVB"), and MERIDIAN BANK, N.A. ("Meridian") (UVB and Meridian are collectively referenced as "the Banks"), pursuant to 11 U.S.C. § 552(a); or (2) the "proceeds, product ... or profits" of pre-petition property, to which the Banks' pre-petition security interests extend, pursuant to 11 U.S.C. § 552(b).

We conclude that, since the sub-leases were, in all except one instance involving but $4,100, evidenced by a "group of writings," they are not "accounts," as defined in 13 Pa.C.S. § 9106. All of the Debtor's post-petition collections except $4,100 are therefore determined to be subject to the Banks' security interests, pursuant to § 552(b).

### B. FACTUAL AND PROCEDURAL HISTORY

This matter arises in connection with a voluntary Chapter 11 bankruptcy proceeding filed by the Debtor on May 30, 1991. As we noted in the fifth of six prior published or to-be-published opinions arising out of this case, *In re Lease–A–Fleet, Inc.,* 148 B.R. 419, 421 (Bankr.E.D.Pa.1992) ("*LAF V*"),

> [t]o describe this bankruptcy case as overlitigated would be an understatement. The protagonists of most of the litigation are, on one hand, the Wolk family, the owners of the Debtor; and Lauderhill on the other. The Debtor was formerly an intermediate lessee of vehicles supplies by Lauderhill and a lessor of these vehicles in turn to small companies mostly located in Florida renting directly to consumers.

We refer the reader to the *LAF V* Opinion and the most recent Opinion arising out of this case, *In re Lease-A-Fleet, Inc., Lease-A-Fleet, Inc. v. Mitsubishi Acceptance Corp.,* 151 B.R. 341, 343–44 (Bankr. E.D.Pa.1993), for a brief recitation of the prior Opinions. The prior Opinion touching most directly on the matters in issue was our first Opinion in this case, *In re Lease–A–Fleet, Inc.,* 131 B.R. 945 (Bankr.E.D.Pa. 1991), *aff'd in part & rev'd in part,* 141 B.R. 63 (E.D.Pa., *aff'd,* 983 F.2d 1051 (3rd Cir.1992) ("*LAF I*"), which involved the allocation of certain post-petition payments received by the Debtor among the Debtor itself, Lauderhill, and the Banks.

The instant proceeding was filed by the Debtor on December 21, 1992. The Debtor alleged in the Complaint that the monies which it received post-petition from sub-lessees were payments on "accounts," as defined by 13 Pa.C.S. § 9106 of the Pennsylvania Uniform Commercial Code ("the UCC"), and, as such, constituted after-acquired property exempt from the claims of its secured creditors pursuant to § 552(a) of the Bankruptcy Code. The Debtor further asserted that these payments were not subject to the security interests of the Banks because they did not represent the "proceeds" of pre-petition security interests, as provided in § 552(b). More specifically, the Debtor claimed that the right to receive lease payments from its customers and the monies received therefrom did not derive from specific motor vehicle lease agreements or orders which could be deemed to constitute "chattel paper" within the meaning of 13 Pa.C.S. § 9105 of the UCC.

The catalyst for this proceeding was probably an Order of this court of November 23, 1992, in which we allowed the Debtor, over the vigorous objection of Lauderhill, to pay the Debtor's general counsel, Rawle & Henderson, and the Debtor's special counsel, Needle and Feldman ("Needle"), $50,000 of $200,000 sought as immediate payment out of the considerable fees allowed to counsel by this court. In a short Memorandum accompanying that Order, we stated that "we are not certain that all of the Debtor's funds in hand *are* secured." Needle, taking on this proceeding as special counsel, obviously hoped to establish herein that most or all of the funds in issue were not subject to the Banks' security interests, and thus that the Debtor possessed unencumbered funds which it could tap to pay counsel. Unfortunately for counsel, the result of this proceeding appears to serve only to weaken counsel's claims.

In support of its allegations, the Debtor attached to its Complaint the following chart relative to the seven of its customers from which it received post-petition payments, reciting the customer/payor, payment received, invoice date, and whether a lease agreement or order allegedly existed between the Debtor and each sub-lessee:

### RENTAL PAYMENTS FOR JUNE 1991 AND JULY 1991

| Customer | Payments | Pursuant to Invoice # | Alleged Pertinent Writings |
|---|---|---|---|
| Caribbean Auto ("Caribbean") | $5,259.48 | 1421 (6/91) | '90 & '91 Master Lease ("ML") and Vehicle Lease Order ("VLO") |
| | 7,208.44 | 1438 (7/91) | '90 & '91 ML & VLO |
| East Coast Auto Rental ("East Coast") | 2,050.00 | 1419 (6/91) | None |
| | 2,050.00 | 1435 (7/91) | " |
| Glenn Auto Rental ("Glenn") | 18,440.00 | 1428 (6/91) | '91 ML and VLO |
| Miami Rent-A-Car ("Miami") | 77,197.32 | 1422 (6/91) | '91 ML and VLO |
| | 81,658.98 | 1439 (7/91) | " |
| Scamp Auto Rental ("Scamp") | 234,111.78 | 1431 (6/91) | None |
| | 174,365.03 | 1448 (7/91) | " |
| Unidas Rent-A-Car ("Unidas") | 11,593.83 | 1426 (6/91) | '91 ML and VLO |
| | 46,382.67 | 1443 (7/91) | " |
| USA Rent-A-Car ("USA") | 12,735.79 | 1423 (6/91) | '90 ML and VLO |
| | 154,785.99 | 1430 (6/91) | None |
| | 15,000.00 | 1446 (7/91) | " |

UCI and Lauderhill (collectively "U & L") filed an answer to the Complaint, denying and challenging the Debtor's characterization of the monies as payment on accounts. Similarly, Meridian filed an answer denying the Debtor's allegations. However, Meridian's answer also included cross-claims and counterclaims requesting, *inter alia,* that we subordinate U & L's claims; subrogate it to Lauderhill's rights in light of its payments to Lauderhill on its letter of credit owed it interest against the Debtor; and find that its security interest

in the Debtor's property extended to any monies recovered by the Debtor in connection with its suit pending against Lauderhill in the District Court, described briefly in *LAF V, supra,* 148 B.R. at 421, or any preferences awarded or to be awarded to the Debtor by this court. *See, e.g., In re Lease–A–Fleet, Inc.,* 141 B.R. 853 (Bankr. E.D.Pa.1992) (Debtor awarded $850,055.53 against Lauderhill in a preference action). Responses to Meridian's crossclaims and counterclaims were not due until March 2, 1993, the date of this decision.

The trial of the instant proceeding was originally scheduled on February 10, 1993. Over Needle's strenuous objection to any continuance, due, undoubtedly, to its self-interest in a quick disposition of this proceeding, the trial was continued to March 4, 1993, to permit the parties to prepare a written stipulation of facts which they all agreed could be done to produce a record.

Again indicating its interest in expediting this proceeding, Needle filed a Motion for Summary Judgment ("the Motion") on the following day, February 11, 1993. The Motion was accompanied by a Declaration of the Debtor's president, Steven Wolk ("Wolk"), which alleged that the payments to the Debtor from the seven sub-lessees at issue were made pursuant only to invoices, and that the documents, if any, evidencing the relationships between the Debtor and these customers did not identify or set forth the specific vehicles leased and lease payments or monetary obligations of its lessees.

By Order dated February 12, 1993, we accorded the other interested parties until February 26, 1993, to file answers to the Motion and/or Briefs in opposition thereto. U & L filed a lengthy document featuring an Affidavit of its local counsel, Maura E. Fay, Esquire ("Fay"), to which was attached copies of leases, lease orders, invoices including vehicle identification numbers (VINs), order forms with Lauderhill, factory invoices, fleet delivery service forms, and other reports generated by the Debtor in reference to all of the seven customers. Meridian filed a Brief which mainly incorporated U & L's responses by reference.

U & L do not at any point contradict the Debtor's assertion that no material factual issues are present, and that summary judgment is appropriate. Hence, they apparently believe, like the Debtor as to its submissions, that their own documentary remittances and legal arguments are sufficient to carry the day for them. Meridian, not being privy to most of these documents, contends that material facts are unresolved. No parties address Meridian's crossclaims and counterclaims. We agree with the Debtor and U & L that the documentary evidence is sufficient to resolve the Debtor's main claim. At pages 17–19 *infra,* we briefly address the merits of one of meridian's counterclaims.

## C. DISCUSSION

1. THE "NARROW EXCEPTION" TO THE GENERAL INVALIDITY OF POST–PETITION SECURITY INTERESTS IS COMPROMISED CONSIDERABLY BY APPLICABLE STATE LAW FACILITATING THE PRESERVATION OF SECURITY INTERESTS.

In order to facilitate debtors' "fresh starts," Congress has limited the effectiveness of creditors' pre-petition security interests on property acquired post-petition by debtors. *See, e.g., In re Bering Trader, Inc.,* 944 F.2d 500, 502 (9th Cir.1991); and *In re Bumper Sales, Inc.,* 907 F.2d 1430, 1436 (4th Cir.1990); *In re Corpus Christi Hotel Partners, Ltd.,* 133 B.R. 850, 855 (Bankr.S.D.Tex.1991); *In re Figgers,* 121 B.R. 772, 777 (Bankr.S.D.Ohio 1990); and 4 COLLIER ON BANKRUPTCY, ¶ 552.01, at 552–2 n. 1 (15th ed. 1993). This principle is set forth at § 552(a) of the Code, which thusly provides the general rule dealing with the applicability of pre-petition security interest to property acquired by a debtor post-petition:

Except as provided in subsection (b) of this section, property acquired by the estate or by the debtor after the commencement of the case is not subject to any lien resulting from any security agreement entered into by the debtor before the commencement of the case.

This general rule is, however, subject to the following exception contained in § 552(b):

> Except as provided in sections 363, 506(c), 522, 545, 547 and 548 of this title, if the debtor and an entity entered into a security agreement before the commencement of the case and if the security interest created by such security agreement extends to property of the debtor acquired before the commencement of the case and to proceeds, product, offspring, rents, or profits of such property, then such security interest extends to such proceeds, product, offspring, rents, or profits acquired by the estate after the commencement of the case to the extent provided by such security agreement and by applicable non-bankruptcy law, except to any extent that the court, after notice and a hearing and based on the equities of the case, orders otherwise.

The issue faced by many courts, including this court in the present matter, is determining whether the property at issue is "after-acquired" property protected by the provisions of § 552(a) or "proceeds" subject to a secured creditor's interest under the exception provided in § 552(b). In making this distinction, it is necessary to focus upon whether the security interests in issue fall within the exceptions provided in § 552(b).

■ There is authority for the principle that § 552(a) states the general rule of the ineffectuality of a pre-petition security interest on a debtor's post-petition assets, to which § 552(b) is a *narrow* exception. *Bering Trader, supra,* 944 F.2d at 502. However, as the Debtor concedes, whether a creditor's rights fit within the § 552(b) exception is determined by reference to applicable non-bankruptcy law of the pertinent jurisdiction, here agreed to be the Pennsylvania UCC. *See Butner v. United States,* 440 U.S. 48, 54–55, 99 S.Ct. 914, 917–18, 59 L.Ed.2d 136 (1979); and *In re TM Carlton House Partners, Ltd.,* 91 B.R. 349, 351 (Bankr.E.D.Pa.1988). The general philosophy behind the UCC is to simplify prior law with the intention of facilitating the creation of broad and effective security interests. *See Klinger v. Pocono Int'l Raceway, Inc.,* 289 Pa.Super. 484, 489–91, 433 A.2d 1357, 1360–61 (1981), quoting Official Comment to 13 Pa.C.S. § 9101.

This secured creditor-friendly philosophy of the UCC renders the exceptions provided in § 552(b) considerably broader than might be expected at first blush. The emerging rule appears to be that, if the parties intended a security interest to have a certain scope in their dealings *inter se,* then such a security interest will be recognized even though the formalities of documentation have not been accomplished. *See In re Cara Corp.,* 148 B.R. 779, 781–82 (Bankr.E.D.Pa.1992); and *In re Silicon Electro–Physics, Inc.,* 116 B.R. 44, 46 (Bankr.W.D.Pa.1990). *Cf. In re Bollinger Corp.,* 614 F.2d 924 (3rd Cir.1980) ("formal" security document between the secured creditor and the debtor is not necessary to create a valid security interest).

2. THE INSTANT BANKS' SECURITY INTERESTS ARE PRESERVED AS TO POST–PETITION COLLECTIONS FROM MOST OF THE DEBTOR'S CUSTOMERS BY THE BROAD STATE–LAW DEFINITION OF "CHATTEL PAPER."

■ In order to determine whether the Banks have valid security interests in the Debtor's lease payments from its customers, we must first determine whether the Banks had valid pre-petition security agreements covering the proceeds at issue. Only the security agreement between the Debtor and Meridian, provided by Meridian in its answer to LAF's Complaint, appears in the record. It provides that

> all of Borrowers's (LAF) present and future accounts, contracts, *chattel paper,* instruments and documents, and *all other rights to the payment of money, including* but not limited to any Specific Property described below, *whether or not yet earned, for services rendered or goods* sold, consigned, *leased or furnished by the Borrower* (LAF), together with all general intangibles, guaranties

and securities relating to any of the of the foregoing ... (emphasis added). UVB's security agreement with the Debtor is not in the record, probably because UVB's interests have been assigned to UCI. However, the Debtor's failure to contest the validity of UCI's pre-petition security interest leads us to conclude that its rights are preserved by language similar to that in Meridian's contract. We would also observe that it would have been difficult for the Debtor to argue, in light of the aforesaid contract language, that it did not intend to give the Banks security interests in the proceeds of its contracts with its customers.

The Debtor's principal, indeed its only, contention is that the Banks' security interests, while valid outside of bankruptcy, do not extend to the lease payments received by the Debtor post-petition in light of the bankruptcy filing, despite § 552(b), because the payments are not the proceeds of "chattel paper." The Debtor argues that the documents required to constitute "chattel paper" did not exist between the Debtor and its customers. More specifically, the Debtor contends that the combination of master leases and vehicle lease orders admittedly in existence as to Caribbean, Glenn, Miami, and Unidas do not describe the vehicles leased and dates of the leases with sufficient specificity to constitute "chattel paper" transactions. With respect to the widely-disparate sums paid to it by East Coast ($4,100), Scamp ($408,476.81), and USA ($169,785.99), see pages 433–34 supra, the Debtor argues that not even a master leases or vehicle lease orders existed. Therefore, as to $582,362.80 of the $842,939.32 of post-petition collections in issue, it contends that it is "beyond dispute" that the documentation is insufficient to constitute the allegedly-requisite "chattel paper."

The definition of "chattel paper" appears in 13 Pa.C.S. § 9105 of the Pennsylvania UCC. It is therein defined as

[a] writing or writings which evidence both a monetary obligation and a security interest in or a lease of specific goods but a charter or other contract involving

the use or hire of a vessel is not chattel paper. *When a transaction is evidenced both by such a security agreement or a lease and by an instrument or a series of instruments, the group of writings taken together constitutes chattel paper* (emphasis added).

Particularly in light of the last sentence of 13 Pa.C.S. § 9105, as emphasized above, this appears to be a very broad definition intended to provide protection to a wide scope of security interests.

The Banks argue that the Debtor, per the Declaration of Wolk that no further documentation exists, is intentionally myopic. U & L, through the Affidavit of Fay, presents documentary evidence to support the fact that not only master leases and vehicle lease orders existed as to Caribbean, Glenn, Miami, and Unidas, but that, in addition, guarantees, Lauderhill's orders and manufacturers' invoices, delivery receipts, and the Debtor's in-service reports, which, taken together, clearly identify each vehicle by VIN, were issued to document every individual transaction.

As to Scamp and USA, U & L notes that master leases and vehicle lease orders were admittedly in place with companies related to each, Lindo's Rental Car Co. ("Lindo") and Global Car Rental Corp. ("Global"), respectively. In the case of Lindo, U & L point to the fact that the Debtor acquiesced in Lindo's sub-leasing its vehicles to Scamp while a transfer of Lindo's assets to Scamp was being negotiated. *See LAF I, supra,* 131 B.R. at 948–49. In the case of USA, per the Affidavit of Fay which is consistent with Wolk's Declaration and our findings at *id.,* 131 B.R. at 949, the Debtor agreed to lease its vehicles to USA through Global, another company owned by the owner of USA, because USA was in bankruptcy. The trustee in the USA bankruptcy documented each payment made by USA pursuant to the contract, which was only nominally executed with Global. Therefore, master leases and vehicle lease orders, as well as other documentation, is alleged by U & L to admittedly exist as to all of the seven customers of the Debtor with the

exception of East Coast. As to East Coast, and East Coast only, there is no evidence of any documentation besides billings and invoices.

The Debtor cites only one case in support of its argument that, where a master agreement is the only documentation of a transaction, that transaction does not involve "chattel paper," *In re ICS Cybernetics, Inc.*, 123 B.R. 467, 475–76 (Bankr. N.D.N.Y.1989), *aff'd*, 123 B.R. 480 (N.D.N.Y.1990). It is perhaps instructive to note that, in *ICS Cybernetics*, the court ultimately found that the transaction in issue *did* involve "chattel paper," because the master agreement was accompanied by a detailed equipment schedule. *Id.* at 476. Therefore, the holding of the *ICS Cybernetics* court that the master agreement itself would be insufficient to create a "chattel paper" transaction, *id.* at 475, was at best dictum. Moreover, this dictum is not pertinent to the instant fact situation, since the Banks have presented evidence of the presence of much more than merely master leases or even master leases plus an equipment schedule as to all of the seven customers in issue except East Coast.

More pertinent to the instant case is the decision in *In re Funding Systems Asset Management Corp.*, 111 B.R. 500, 515–16 (Bankr.W.D.Pa.1990), where the court discussed, at some length, the issue of what constitutes "chattel paper" under Pennsylvania law. There, the allegedly secured creditor, which leased computers and accessories to the debtor pre-petition, asserted that lease payments paid by debtor's customers were the proceeds of "chattel paper" subject to its security interest. The court, in determining that the transactions in issue involved "chattel paper," stated, at *id.*, that

> [e]ach of the challenged transactions in this case is evidenced *by a group of writings, which together constitute the chattel paper. Specifically, the chattel paper includes the equipment schedules, the master leases, and the assign-ment, assumption and indemnity agreements (where they exist).*

Both the master leases and the equipment schedules constitute chattel paper. Only the equipment schedule specifies the equipment to be leased, the amount of the monthly rental payments, and the terms of the lease. The master lease contains none of these provisions but, instead, sets forth general terms and conditions concerning such matters as the use of the equipment, maintenance and repairs, inspection, warranties, risk of loss, etc. The equipment schedule, however, does not contain these terms and provisions. Rather, it incorporates by reference those general provisions of the master lease as though they were fully set forth in the equipment schedule. *The master lease and the equipment schedule, when taken together, evidence a monetary obligation and a lease of specific goods* (emphasis added).

The *Funding Systems* court ultimately held that only certain transactions before it were validly secured, because no underlying financing statement had been filed as to many of the transactions in issue. *Id.* at 575. Here, however, there is no dispute that the Banks' underlying financing statements were properly filed. *See* pages 435–36 *supra. Funding Systems* is therefore important because it interprets the definition of "chattel paper" in 13 Pa.C.S. § 9105, we think properly, as requiring consideration of all of the documents relevant to a given transaction. *Accord, In re Keneco Financial Group, Inc.*, 131 B.R. 90, 95 (Bankr.N.D.Ill.1991).

The fact that the documents relevant to the Scamp and USA transactions were executed by different parties than the customers themselves is not, as the Debtor asserts, significant in this factual context. As U & L point out in their Brief, all contracts are not separable into the categories of "accounts" and "chattel paper." There is a residual classification, "general intangibles," which includes assets which are neither "accounts" nor "chattel paper"

transactions. 13 Pa.C.S. § 9106. Assuming *arguendo* that the Scamp and USA transactions are not supported by "chattel paper," they are supported by significant specific and relevant documentation. Therefore, they are not "accounts" and would fit into the category of "general intangibles" if not into the category of "chattel paper" transactions.

Two cases cited by U & L stand for the principle that proceeds of contracts assigned to entities other than the debtor granted a security interest to a creditor are subject to security agreements between the debtor and that creditor which cover "general intangibles." *United Virginia Bank v. Slab Fork Coal Co.*, 784 F.2d 1188, 1190–91 (4th Cir.1986); and *In re Sunberg*, 729 F.2d 561, 562–63 (8th Cir.1984).

■ The only sub-lessee concerning which no evidence of any "group of writings taken together" which provides specific identity of the vehicles leased to it was East Coast. We agree with the Debtor that its relationship with this small ($4,100 payments) customer and this customer alone, fits the definition of an "account" transaction. The Debtor is therefore entitled to summary judgment as to East Coast only.

■ Although the Defendants have not filed cross-motions for summary judgment, the proposed Order attached to U & L's Brief requests, in substance, that summary judgment be entered in their favor. We note that it is proper to grant summary judgment in favor of the non-moving parties if there is support for a result in their favor in the record, despite the absence of a formal cross-motion for summary judgment by the non-moving parties. *See Missouri P. R.R. v. National Milling Co.*, 409 F.2d 882, 887 & n. 4 (3rd Cir.1969); *In re CS Associates, United Jersey Bank v. Miller*, Bankr. No. 88–12842S, Adv. No. 92–1107S, slip op. at 5, 1993 WL 18339 (Bankr. E.D.Pa. January 20, 1993); and 6 J. MOORE, FEDERAL PRACTICE, ¶ 56.12, at 56–162 to 56–165 & n. 5 (2d ed. 1993).

**3. ALTHOUGH WE CANNOT DECIDE MERIDIAN'S CROSSCLAIMS AND COUNTERCLAIMS AT THIS JUNCTURE, WE NOTE OUR BELIEF THAT MERIDIAN HAS NO VALID SECURITY INTEREST IN THE DEBTOR'S PREFERENCE RECOVERIES.**

■ The crossclaims and counterclaims of Meridian raise several issues which are not before us for disposition at this time and may be relegated to other proceedings or actions at later times, including rights against U & L pursuant to 11 U.S.C. § 510(c) (subordination), and 11 U.S.C. § 509(a) (subrogation), and a claim for interest against the Debtor under 11 U.S.C. § 506(b). One issue raised in the counterclaims which we are prepared to briefly address is Meridian's claim, under that aspect of its security agreement covering "general intangibles," to the proceeds of the Debtor's preference litigation. While we acknowledge Meridian's attachment of an Order of Chief Judge Twardowski of this court supporting the conclusion that proceeds of a preference action may be subject to such a security interest when the security interest in issue arises post-petition, *In re Reading China & Glass Co.*, 126 B.R. 35 (Bankr.E.D.Pa.1992), we find logic and the weight of authority against Meridian where, as here, the security interest in issue arose pre-petition.

In this regard, we reiterate the principle that § 552(b) is a narrow exception to the general rule that property acquired by a debtor post-petition is not subject to pre-petition security interests. *See* pages 434–35, 435 *supra*. Thus, Collier states that

> monies recovered as the result of a preference action are generally not found to be "proceeds" of the creditor's collateral within the meaning of section 552(b) because such a cause of action is generally one that can be pursuant only by a trustee.

4 COLLIER, *supra*, ¶ 552.02, at 552–15. *Accord, In re Integrated Testing Products Corp.*, 69 B.R. 901, 904–05 (D.N.J.1987)

(also relying upon 11 U.S.C. § 551); *In re Tek–Aids Industries, Inc.*, 145 B.R. 253, 256 (Bankr.N.D.Ill.1992); *In re Sun Island Foods*, 125 B.R. 615, 618–20 (Bankr.D.Hawaii 1991); and *In re Ludford Food Products, Inc.*, 99 B.R. 18, 24–27 (Bankr. C.D.Cal.1989). Although there is early contrary authority in this district, *see In re Cambria Clover Mercantile Co.*, 51 B.R. 983, 985 (Bankr.E.D.Pa.1985), and elsewhere, *see, In re Enserv Co.*, 64 B.R. 519, 521 (Bankr. 9th Cir.1986); *In re Ellingsen McLean Oil Co.*, 98 B.R. 284, 289–91 (Bankr.W.D.Mich.1989); *In re Figearo*, 79 B.R. 914, 917–18 (Bankr.D.Nev.1987); *In re Mid–Atlantic Piping Products of Charlotte, Inc.*, 24 B.R. 314, 315 (Bankr. W.D.N.C.1982); and *In re Phoenix Marine Corp.*, 20 B.R. 424, 425–26 (Bankr.E.D.Va. 1982), this court has already indicated that it found the reasoning of *Integrated Testing* "persuasive." *In re Capitol Pipe & Steel Products, Inc.*, Bankr. No. 87–00262S, slip op. at 5 (Bankr.E.D.Pa. March 31, 1987). We still find that line of reasoning the more persuasive and believe that it constitutes the emerging majority rule, which we are prepared to follow.

## D. CONCLUSION

Since all that is before us at present is the Debtor's Motion for Summary Judgment on the issue of the Defendants' security interests in the Debtor's post-petition collections of $842,939.32 from seven of its customers and because we deem it appropriate to consider the Defendants' responses as cross-motions for summary judgment on this issue, we will enter an Order granting the Debtor's Motion as to East Coast only, and entering summary judgment in favor of the Defendants as to the collections by the Debtor from its other six customers in issue.

We will conduct only a conference on the issues raised in Meridian's crossclaims and counterclaims on the scheduled trial date of March 4, 1993, as we do not believe that the other interested parties have had a sufficient opportunity to respond thereto.

## ORDER

AND NOW, this 2nd day of March, 1993, upon consideration of the Plaintiff–Debtor's Motion for Summary Judgment ("the Motion") and accompanying Memorandum of Law in this proceeding; the responses of the Defendants thereto; and the Briefs of all interested parties, it is hereby ORDERED AND DECREED as follows:

1. The Motion is GRANTED in small part, as to the $4,100 collected by the Debtor from East Coast Auto Rental. That amount only is DECLARED to be free and clear of the Defendants' security interests. As to the Debtor's collections from all of its other customers in issue, the Motion is DENIED.

2. Summary judgment is GRANTED in favor of the Defendants as to all of the other customers of the Debtor in issue. As to these parties, the sums collected are DECLARED to be subject to the security interests of UNIVERSITY CADILLAC, INC. and MERIDIAN BANKR, N.A., and, to the extent that any secured claims by that party are established, to any potential security interest of MORSE OPERATIONS, INC. t/a LAUDERHILL LEASING.

3. This Proceeding remains scheduled for a status conference as to the remaining claims on the scheduled date of trial, *i.e.,* on

THURSDAY, MARCH 4, 1993, at 9:30 A.M. in Courtroom No. 2 (Room 3718), United States Court House, 601 Market Street, Philadelphia, PA 19106.