In re LEASE–A–FLEET, INC., Debtor.

MORSE OPERATIONS, INC. d/b/a Lauderhill Leasing and University Cadillac, Inc. on behalf of Lease–A–Fleet, Inc., Plaintiffs,

v.

GOODWAY GRAPHICS OF VIRGINIA, INC., Defendants.

MORSE OPERATIONS, INC. d/b/a Lauderhill Leasing and University Cadillac, Inc. on behalf of Lease–A–Fleet, Inc., Plaintiffs,

v.

GOODWAY GRAPHICS OF MASSACHUSETTS, INC., Defendant.

MORSE OPERATIONS, INC. d/b/a Lauderhill Leasing and University Cadillac, Inc. on behalf of Lease–A–Fleet, Inc., Plaintiffs,

v.

Donald WOLK and Beryl Wolk t/a GGM Co., Defendants.

Bankruptcy No. 91–12996S.
Adv. Nos. 92–1071S, 92–1072S, 92–1103S.

United States Bankruptcy Court, E.D. Pennsylvania.

June 17, 1993.

668

Karen Lee Turner, Philadelphia, PA, for Morse Operations, Inc. d/b/a Lauderhill Leasing and University Cadillac, Inc. on behalf of Lease-A-Fleet, Inc.

David Braverman, Fellheimer & Eichen, P.C., Philadelphia, PA, for defendants Goodway Graphics of Virginia, Inc., Goodway Graphics of Massachusetts, Inc., and Donald Wolk and Beryl Wolk t/a GGM Co.

Patrick J. Stapleton, III, Philadelphia, PA, for debtor.

Michael R. Needle, Philadelphia, PA, Special Counsel for debtor.

Robert Sayre, Patterson & Weir, Philadelphia, PA, for Meridian Bank.

Frederic Baker, Asst. U.S. Trustee, Philadelphia, PA.

## OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

### I. INTRODUCTION

Before this court for resolution after trial are three adversary proceedings commenced by MORSE OPERATIONS, INC. d/b/a LAUDERHILL LEASING ("Lauderhill"), easily the largest unsecured creditor of LEASE–A–FLEET, INC. ("the Debtor"), and UNIVERSITY CADILLAC, INC. ("UCI"), an entity related to Lauderhill which is the assignee of United Valley Bank, the Debtor's largest remaining secured creditor[1] (collectively Lauderhill and UCI are referred to as "U & L"), on behalf of the Debtor, seeking to recover almost $3.3 million dollars from three affiliates of the Debtor, GOODWAY GRAPHICS OF VIRGINIA, INC. ("G–V"); GOODWAY GRAPHICS OF MASSACHUSETTS, INC. ("G–M") (collectively G–V and G–M are referenced as "the Goodways"); and DONALD WOLK ("Donald") and BERYL ("Beryl") WOLK t/a GGM CO. ("GGM") (collectively G–V, G–M, and GGM are referenced as "the Affiliates"). U & L allege that certain payments to the Affiliates by the Debtor represent fraudulent conveyances and/or preferential transfers made by the Debtor to the Goodways and preferential transfers to GGM.[2]

The instant proceeding is in some ways a reversal of the roles of the parties in *In re Lease–A–Fleet, Inc.,* 141 B.R. 853 (Bankr. E.D.Pa.1992) (referenced hereinafter as *"LAF I"*), a preference action against Lauderhill arising out of this same bankruptcy case in which the Debtor was awarded $850,055.33. Here, U & L, standing in the shoes of the Debtor, seek to recover preferences and/or fraudulent conveyances against entities controlled by the family which owns the Debtor. In conformity with notions of fair play, as well as "the law of the case," we are very strongly inclined to apply factual findings and legal conclusions rendered in *LAF I* to the instant controversy. We also note that several issues which arose in *LAF II* reappear here, and we have tried to treat these issues consistently with our treatment there as well.

Our decisions in the instant matters require the resolution of several issues. Firstly, we must determine whether the transfers to the Goodways are avoidable because the Debtor, in making them, committed actual fraud upon its creditors. Secondly, if we find that these transfers did not occur as a result of actual fraud, this court must decide whether the transactions between the Debtor and the Goodways constituted constructive fraudulent conveyances. Deciding the instant constructive fraud claims requires this court to determine whether (1) the transfers are separate and distinct transactions viewed in isolation or must be considered as part of a series of occurrences which must be combined with related transactions in determining whether adequate consideration passed hands; and (2) the Debtor was insolvent, was left with unreasonably small capital, or incurred debt it believed was beyond its ability to repay at the time of the transfers

---

1. This assertion assumes that the Debtor's global settlement with the Debtor's former largest secured creditor, Meridian Bank ("Meridian"), approved by this court in *In re Lease–A–Fleet, Inc.,* 1993 WL 102041 (Bankr.E.D.Pa. March 19, 1993) (referenced hereafter as *"LAF II"*), withstands U & L's appeal.

2. There is no evidence of record to support the Affiliates' assertion, in its post-trial Brief, that U & L have sought to amend their Complaint to add fraudulent conveyance claims against GGM thereto.

in issue, some of which precede the Debtor's bankruptcy filing by more than a year. Thirdly, the court must decide whether the payments to any of the Affiliates were avoidable as preferential transfers, considering the elements of such transfers set forth in 11 U.S.C. § 547(b) and the affirmative defenses set forth in 11 U.S.C. § 547(c) applicable thereto.

We find that the fraudulent conveyance claims against the Goodways cannot be sustained, since U & L failed to prove that LAF committed actual fraud under the requisite "clear and convincing evidence" standard or to prove constructive fraud, because they were unable to establish that the Debtor actually transferred its assets without consideration. U & L also cannot recover upon its preference claims against the Goodways, nor can it recover on most of its preference claims against GGM because the Debtor received new value following these transfers. However, utilizing the new value analysis put forth in *LAF I*, U & L is entitled to recover, on the Debtor's behalf, a preference claim against GGM in the amount of $173,000.

## II. FACTUAL AND PROCEDURAL HISTORY

The underlying voluntary Chapter 11 bankruptcy case was filed by the Debtor on May 30, 1991. Since its initiation, this matter has been marred by intense litigation, mostly between the Debtor, formerly an intermediate lessor of automobiles to small retail motor vehicle rental agencies, and its former supplier-lessor of vehicles, Lauderhill. These disputes have resulted in numerous published decisions of this court, as well as several from the district court in litigation the reference of which to this court was withdrawn. A summary of all of the five reported decisions prior thereto appears in *In re Lease–A–Fleet, Inc.*, 151 B.R. 341, 343–44 (Bankr.E.D.Pa.1993), and will not be repeated here, except to add a

reference to the immediately subsequent Opinion in *In re Lease–A–Fleet, Inc.*, 152 B.R. 431 (Bankr.E.D.Pa.1993), in which we determined that UCI and Meridian had valid security interests in the Debtor's post-petition proceeds from its lessees, and the decision in *LAF II* noted herein.

The conception of these particular actions can be traced to a motion filed by Lauderhill in the Debtor's main bankruptcy case on June 22, 1992, in which it requested permission to sue Meridian and Robins Le-Cocq Corp. ("Robins"), the parent of the Goodways,[3] as well as the Affiliates to recover preferences and fraudulent conveyances. *See LAF II*, slip op. at *2–*3.[4]

Lauderhill's above-referenced motion, ultimately joined by UCI, was granted in an Order of September 10, 1992. The instant proceedings were filed against the Goodways on October 23, 1992, and against GGM on November 6, 1992. The initial trial dates were all continued until January 6, 1993. After hearings on certain discovery disputes on December 23, 1992, the matters were, by agreement, listed together for a consolidated trial on an must-be-tried basis on March 25, 1993.

U & L also filed two "motions in limine" in connection with these proceedings, seeking pre-trial determinations as to (1) the appropriate statute of limitations on its state-law causes of action; (2) whether it or the Defendants bore the burden of proof regarding insolvency if it proved lack of fair consideration, similar to motions filed in the suit against Meridian. *See LAF II*, slip op. at *3. Prior to the trial of the lawsuit considered in *LAF II*, we entered an Order of January 19, 1993, on the limitations issue, barring any claims which accrued prior to May 30, 1989. This decision was based upon the reasoning expressed in *In re Shields*, 148 B.R. 783, 786–87 (Bankr. E.D.Pa.1993). Since they were aware of this ruling, the parties to the matters proceeded within its parameters.

---

3. In one of its most imaginative and least-successful sallies against the Wolks and their various entities, Lauderhill attempted to "substantively consolidate" the affairs of Robins with those of the Debtor in the underlying main bankruptcy case. *See In re Lease–A–Fleet, Inc.*, 141 B.R. 869 (Bankr.E.D.Pa.1992).

4. The recitation therein that U & L had initiated litigation against Robins which was scheduled for trial on March 25, 1993, was erroneous. The third defendant in the instant consolidated proceedings was of course GGM, not Robins.

U & L ultimately contended that, among a larger number of transfers originally challenged as avoidable in their Complaints filed against the Affiliates, the Debtor made fraudulent conveyances or preferential transfers of the following amounts on the following respective dates to the Goodways:

G–V

| Date of Transfer | Amount |
| --- | --- |
| 11/30/89 | $ 100,000 |
| 12/23/89 | 230,000 |
| 3/22/90 | 90,000 |
| 5/25/90 | 125,000 |
| 5/25/90 | 15,000 |
| 5/29/90 | 60,000 |
| 3/13/91 | 80,000 |
| 4/29/91 | 20,000 |
| TOTAL | $ 720,000 |

G–M

| | |
| --- | --- |
| 11/28/89 | $ 240,509 |
| 12/28/89 | 396,513 |
| 5/25/90 | 50,000 |
| 5/25/90 | 50,000 |
| 11/09/90 | 100,000 |
| 12/08/90 | 352,750 |
| 12/20/90 | 300,000 |
| TOTAL | $1,289,772 |

Similarly, U & L's Complaint against GGM alleges that the Debtor made the following preferential payments to GGM:

| | Date | Amount |
| --- | --- | --- |
| 1. | 6/6/90 | $ 200,000 |
| 2. | 6/12/90 | 200,000 |
| 3. | 8/3/90 | 35,000 |
| 4. | 9/5/90 | 118,000 |
| 5. | 9/6/90 | 38,000 |
| 6. | 9/14/90 | 44,000 |
| 7. | 11/30/90 | 100,000 |
| 8. | 12/4/90 | 50,000 |
| 9. | 12/11/90 | 55,000 |
| 10. | 1/4/91 | 25,000 |
| 11. | 1/14/91 | 20,000 |
| 12. | 1/17/91 | 25,000 |
| 13. | 1/24/91 | 20,000 |
| 14. | 2/1/91 | 20,000 |
| 15. | 2/4/91 | 110,000 |
| 16. | 2/7/91 | 25,000 |
| 17. | 2/8/91 | 20,000 |
| 18. | 2/21/91 | 30,000 |
| 19. | 2/22/91 | 60,000 |
| 20. | 3/5/91 | 60,000 |
| 21. | 3/19/91 | 220,000 |
| TOTAL | | $1,383,000 |

A consolidated trial, marked by considerable unnecessary rancor, most of which emanated from the Affiliates' lead counsel, was conducted by this court over a period of approximately sixteen (16) hours on March 25, 29, 30 and 31, 1993.

U & L's first witness was accountant George Miller, reiterating much of his testimony noted in *LAF II*, slip op. at *4, *5, *9. Miller opined that, at the time of all of the transfers at issue, the Debtor was insolvent. In support of his conclusion, Miller submitted to the court documents which his firm prepared which purported to set forth accurately the financial condition of the Debtor based upon reconstructed balance sheets which his firm had prepared for each month of the time period between May, 1989, and May, 1991. Miller testified that the documents which his firm prepared, unlike those of the Debtor which had reflected its solvency at the time of a majority of the transfers, accurately reflected the financial condition of the Debtor on the dates at issue. Miller indicated that the main differences between his and the Debtor's balance sheets were attributable to the fact that his firm complied with generally accepted accounting practices ("GAAP") and included all contingent liabilities in their calculations.

The most significant witnesses for the defense were (1) Steven Wolk, the Debtor's owner ("Steven"); (2) Donald, Steven's father, the owner of the Goodways and, with his brother Beryl, one of two partners of GGM; and (3) David Mallenbaum, Esquire, Steven's brother-in-law who serves as house counsel for many if not all of the Wolk-owned entities. Steven testified that he was not involved with the specifics regarding the transfers at issue. He did note that the Debtor often borrowed money from his father and his father's companies on a short-term basis in order that the Debtor could pay its bills, notably the Debtor's monthly leasing bill to Lauderhill.

Also testifying which reluctance due to the purported inability of the Affiliates to compensate him, was William H. Tennant,

Jr., an accountant called by Meridian as its expert witness in the trial referenced in *LAF II.* Tennant testified that, at the request of Meridian, he had conducted an analysis of the Debtor's balance sheets. After getting data from a review of the Debtor's records, Tennant stated that he adjusted the balance sheets on a non-GAAP basis to derive the net realizable sale value of the Debtor at several points in time. His testimony from the *LAF II* hearing, wherein he concluded that the Debtor was solvent until at least the end of 1990, was submitted into the record.

Mallenbaum testified that he had analyzed the transfers at issue and that, following his review of the records of the Debtor, the Goodways, and Robins, concluded that most of the transfers to the Goodways were characterized as "circles of cash" in which the same or nearly the same amount of funds flowed from the Debtor to the Goodways, the Goodways to Robins, and from Robins back to the Debtor again in a period of a few days, the purpose of which were to provide the Debtor with cash despite its obligations to Robins. In support of his conclusions, Mallenbaum prepared and submitted to the court documents illustrating these "circles of cash."

Donald testified that the Debtor was formed by himself and his brother Beryl as a successor to Goodway Automotive Systems, Inc. ("GAS"), a lessor of reconditioned vehicles to small companies which leased vehicles to the general public, and which was subsequently sold to Steven in January, 1990. Prior to the sale to Steven, Donald testified that the Debtor, as do the Goodways at present, had compensated Donald and Beryl through payment of management fees to Robins. As part of this sale of the Debtor to Steven, Donald stated that it was agreed that Donald and Beryl would be compensated for the sales commission associated with the account of Lindo's Rental Car Co. ("Lindo"), the Debtor's largest customer, and for a reduced level of continuing management services provided to the Debtor. Donald further stated that recordation of these payments was the driving force behind the transfers at issue. He claims that, in order to aid the Debtor

in payment of its debts, but to avoid local "millage taxes" payable by Robins, as a local entity, and not by the Goodways, whose places of business were elsewhere, the monies in question were circulated from the Debtor to the Goodways, from the Goodways to Robins, and from Robins back to the Debtor in the manner described by Mallenbaum.

U & L presented rebuttal testimony from Daniel Coffey, an accountant employed by Miller's firm, to counter the Affiliates' claim that the transfers of monies had no negative impact upon the Debtor. Coffey stated that the ultimate effect of these transfers upon the Debtor was a loss in its net equity in excess of $1 million.

At the conclusion of the trial the parties were afforded an opportunity to file post-trial briefs by April 21, 1993 (U & L) and May 12, 1993 (the Affiliates). A timely brief was filed by U & L. However, the date for the Affiliates' filing was extended at its request on two occasions, ultimately until May 21, 1993.

On April 16, 1993, U & L filed a motion, granted on April 29, 1993, without opposition, requesting permission to supplement the trial record with a Memorandum and Order of the District Court of April 12, 1993, in the matters of which it had withdrawn the reference. The aforesaid District Court decision denied Lauderhill's motions for judgments n.o.v., but granted its motions for a new trial on all of the claims as to which the Debtor and the Wolks had been successful against Lauderhill in obtaining jury verdicts which totalled an approximate amount of $3.1 million. On June 2, 1993, U & L filed a motion to strike certain statements and an exhibit attached to the Affiliates' brief. We have not considered the exhibit or the disputed statements in rendering our decision and therefore will deny this Motion as moot.

*C. DISCUSSION*

1. APPLICABLE STATUTORY PROVISIONS FOR FRAUDULENT CONVEYANCES.

It has long been recognized that debtors often attempt to evade the payment of

legitimate debts by concealing or transferring property. *See, e.g.,* L. Verner, *Transfers in Fraud of Creditors Under the Uniform Acts and the Bankruptcy Code,* 92 COMMERCIAL L.J. 219 (1985). Legislative attempts to rectify such actions include the provisions set forth at 11 U.S.C. § 548 of the Bankruptcy Code and the Uniform Fraudulent Conveyances Act, which has been adopted by several states, including Pennsylvania, at 39 P.S. §§ 351 *et seq.* ("the UFCA"). Both of these statutory provisions provide remedies for both actual and constructive fraudulent conveyances.

In the instant matter, U & L seeks to avoid transfers made by the Debtor to the Goodways under both actual fraud and constructive fraud theories. U & L relies upon the following provisions of the Code and the UFCA in making these claims:

*11 U.S.C. § 548*

(a) The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily—

(1) made such transfer or incurred such obligation with actual intent to hinder, delay or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted; or

(2)(A) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

(B)(i) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;

(ii) was engaged in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital; or

(iii) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured.

*UFCA, 39 P.S.*

§ 354. Conveyances by insolvent.

Every conveyance and every obligation incurred by a person who is or will thereby without regard to his actual intent, if the conveyance is made or the obligation is incurred without fair consideration.

§ 355. Conveyances by persons in business

Every conveyance made without fair consideration, when the person making it is engaged, or is about to engage, in a business or transaction for which the property remaining in his hands after the conveyance is an unreasonably small capital, is fraudulent as to creditors, and as to other persons who become creditors during the continuance of such business or transaction, without regard to his actual intent.

§ 356. Conveyances by a person about to incur debts

Every conveyance made and every obligation incurred without fair consideration, when the person making the conveyance or entering into the obligation intends or believes that he will incur debts beyond his ability to pay as they mature is fraudulent as to both present and future creditors.

§ 357. Conveyance made with intent to defraud

Every conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors.

2. THE TRANSFERS TO THE GOODWAYS CANNOT BE AVOIDED ON THE GROUND OF ACTUAL FRAUD BECAUSE U & L HAS NOT PRESENTED "CLEAR AND CONVINCING" EVIDENCE THAT THE DEBTOR COMMITTED SAME.

■ In order to prevail on their claim of actual fraud under either the Code or the UFCA, U & L were obliged to prove that the Debtor had an "actual intent" to "hin-

der, delay or defraud" its creditors in making the instant transfers to the Goodways. Moreover, the standard of proof for U & L as to each necessary element of such claims of fraud was the demanding standard of proving same by "clear and convincing evidence." *See Tunis Bros. v. Ford Motor Co.,* 952 F.2d 715, 731 (3rd Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 3034, 120 L.Ed.2d 903 (1992); *Ratay v. Lincoln Nat'l Life Ins. Co.,* 378 F.2d 209, 212 (3rd Cir.), *cert. denied,* 389 U.S. 973, 88 S.Ct. 472, 19 L.Ed.2d 465 (1967); and *In re Pinto Trucking Service, Inc.,* 93 B.R. 379, 386 (Bankr.E.D.Pa.1988).

Much of U & L's Brief in support of these claims consists of argumentative epithets directed against the alleged perfidy of the Wolks. Unfortunately, these colorful characterizations are not supported by any hard evidence. In those portions of these arguments devoted to the law, U & L relies upon the following "badges of fraud" set forth by this court in *In re Cohen,* 142 B.R. 720, 728 (Bankr.E.D.Pa.1992):

(1) lack or inadequacy of consideration;

(2) the family, friendship or close associate relationship between the parties;

(3) the retention of possession, benefit or use of the property in question, although title exists in another entity;

(4) the financial condition of the party sought to be charged both before and after the transaction in question;

(5) conveyance of all of the debtor's property;

(6) secrecy of the conveyance;

(7) existence of a trust or trust relationship between the debtor and the person to whom the property was conveyed;

(8) the existence or cumulative effect of a pattern of series of transactions or a course of conduct after the incurring debt, onset of financial difficulties, or pendency or threat of suit by creditors;

(9) the instrument affecting the transfer suspiciously states it is in fact bona fide;

(10) the debtor makes a voluntary gift to a family member; and

(11) the general chronology of events and transactions under inquiry.

*Cf. In re Pinto Trucking Service, supra,* 93 B.R. at 386, quoting the Uniform Fraudulent Transfers Act, 7A UNIFORM LAWS ANNOT. 653 (1965) (similar listing).

Specifically, U & L contends that the following "badges of fraud" exist in the present matter:

1) *Lack of adequate consideration.* The Goodways admittedly provided no services to the Debtor in exchange for the payments;

2) *A close associate relationship between the parties.* The Goodways were owned by the Donald and Beryl, the former owners of the Debtor and the father and uncle, respectively, of the Debtor's present owner;

3) *The Debtor retained control of the money.* Since the monies involved were transferred from the Debtor to the Goodways to Robins and back to the Debtor, the Debtor allegedly retained control of the money.

4) *The Debtor's financial condition both before and after transfers.* The Debtor was allegedly insolvent both before and after all the transfers at issue because its assets were less than its liabilities.

6) *The transfers were concealed by the Debtor.* The Debtor hid the transfers by concealing their true nature and characterizing them as printing expenses when no such expenses were incurred.

In addition to the *Cohen* factors, U & L urge a finding of actual fraud because the Debtor allegedly committed tax fraud against the federal government by treating the payments as deductible tax expenses and against the local taxing authorities by avoiding the millage taxes otherwise payable by Robins.

 We find that only the second and possibly the sixth "badge of fraud" were proven with any degree of evidence ap-

proaching the applicable "clear and convincing" standard. The evidence does not suggest a lack of consideration because, while money flowed out of the Debtor to the Goodways for no apparent consideration, each transfer triggered a transfer from Robins to the Debtor which was equally lacking in consideration from the Debtor. The net result is that money passed through the Debtor with no gain and no loss in the Debtor's ability to pay its creditors. The evidence does *not* support the Debtor's "control of assets" transferred by it to the Goodways. Rather, the transfers were triggered by Robins and ended with a transfer by Robins to the Debtor. Each transfer was, as Mallenbaum stated, fairly characterized as a "circle of cash" from which the Debtor had no power to withdraw its participation. There is no evidence that the instant transfers caused the Debtor to devolve from a solvent state to an insolvent state, as is the thrust of the fourth "badge." Each circle of transfers did not appear to have any real effect on the Debtor's solvency. Even Miller's testimony would not support this conclusion, because he believed that the Debtor was insolvent both *before and after* each of the transfers in issue.

■ The existence of the remaining two "badges" (the second and sixth) are, in and of themselves, not worth very much. These "badges," plus a few more including the spectre of *actual* transfers of assets (which we do not find here) were present in *Cohen, supra,* 142 B.R. at 729. However, finding that the transfers in issue there did not and were not reasonably intended to hinder or delay creditors, no fraudulent conveyance was found. *Id.* at 729–30.

■ Instead of suggesting a grand scheme to defraud creditors, the evidence suggests that the Goodways and the Debtor were sister entities that were controlled by the profitable, parent-entity of the Goodways (Robins), which provided financial assistance to the Debtor when it was needed. That the means for providing this financial assistance, while somewhat convoluted for probably some as yet undefined tax benefit, constituted an actual intent by the Debtor to commit fraud upon its creditors is not supported by the record. Specifically, with regard to the claim of tax fraud, we observe that a taxpayer's arranging its affairs in such a manner as to minimize its tax liability, as appears to be the case here, is not the equivalent of tax fraud. Consequently, on the record before this court, we cannot find or even come close to finding the requisite "clear and convincing evidence" that the Debtor committed actual fraud upon its creditors in the course of the instant transfers.

3. THE TRANSFERS TO THE GOODWAYS CANNOT BE AVOIDED UNDER THE CONSTRUCTIVE FRAUD PROVISIONS OF THE BANKRUPTCY CODE OR THE UFCA BECAUSE U & L.FAILED TO PROVE THAT THE DEBTOR RECEIVED INADEQUATE CONSIDERATION IN THE TRANSFERS.

■ U & L contends, though with considerably less effort and vigor, that the transfers in issue are avoidable under the constructive fraud provisions of the Bankruptcy Code and the UFCA as well. Under both of these statutes, quoted at pages 672–73 *supra,* U & L is required to meet basically the same two-prong test. It must prove that the Debtor both (1) received inadequate consideration for the transfers; and (2) was insolvent at the time of the transfers or became insolvent as a result of them; was left with unreasonably small capital after the transfers; or was aware that it was unable to pay future debts as they became due as a result of these transfers.

■ In support of its argument that the Debtor received inadequate consideration for these transfers, U & L relies upon several factors. Firstly, they assert that the trial and deposition testimony of Donald from the District Court litigation, coupled with his testimony in the present trial that the Goodways provided little if any printing services to the Debtor, clearly proves that the Debtor did not receive a fair exchange or adequate consideration for

the payments at issue. Secondly, U & L argue that the Debtor's different descriptions of the transactions in the Debtor's journals and ledgers from the characterizations at trial of the transfers as "circles" of monies flowing among Robins, the Goodways, and the Debtor is an attempt by the Affiliates to re-characterize the transactions simply to meet the adequate consideration requirement. Thirdly, U & L claim that the conflicting descriptions of the payments (printing services, management fees, and Lindo commissions) demonstrate that the transfers were not made in good faith, and that therefore they are able to meet the inadequate consideration requirement for constructive fraud.

U & L submitted the testimony of Miller to attempt to establish that the Debtor was insolvent or became insolvent at the time of the transfers at issue. Miller's testimony and the monthly balance sheets he prepared were also relied upon by U & L as proof that the Debtor was undercapitalized and unable to pay its debts as they become due. *See* pages 679–81 for an evaluation of the Debtor's solvency.

Our review of the testimony and evidence presented by U & L at the time of trial reveals that it failed to meet the first prong of the dual constructive fraud requirements. We find that, looking at the transactions among Robins, the Goodways, and the Debtor as a whole, U & L has failed to prove that the Debtor received inadequate consideration in exchange for the transfers at issue.

Support for the propriety of collapsing the transactions among all three of the entities in issue and viewing them as a whole is drawn from the reasoning of *United States v. Tabor Court Realty Corp.*, 803 F.2d 1288 (3rd Cir.1986), *cert. denied sub nom. McClellan Realty Corp. v. United States*, 483 U.S. 1005, 107 S.Ct. 3229, 97 L.Ed.2d 735 (1987). In *Tabor Court*, upholding the district court's finding that a leveraged buy-out constituted a fraudulent conveyance for lack of adequate consideration, the Court stated, *id.* at 1302, that

[a]dmittedly, in the course of its determination that the ITT–Raymond group

transaction was without fair consideration under section 353(a), the court looked beyond the exchange of funds between ITT and the Raymond Group. But there was reason for this. *The two exchanges were part of one integrated transaction.* As the court concluded: "[t]he $4,085,000 in ITT in loan proceeds which were lent immediately by the borrowing companies to Great American were merely passed through the borrowers to Great American and ultimately to the selling stockholders and cannot be deemed consideration received by the borrowing companies." ... (emphasis added).

Like the transfers at issue in *Tabor Court*, the transfers at issue in the Goodways cases cannot be viewed in isolation. The transfers from the Debtor to the Goodways were not isolated, but were driven by transfers from Robins to the Debtor and were accompanied by transfers from the Goodways to Robins. Each of the circular financial transactions between the parties in issue must therefore be "collapsed" into one transaction to appreciate their impact upon the Debtor. When each circle of cash is viewed as a single transaction, it is clear that the same monies simply passed through from Robins to the Debtor to the Goodways and back to Robins.

Unlike the debtors in *Tabor Court*, the instant Debtor did not pledge or surrender any assets in the course of these transactions. Instead, the effect of the transfers was a change in the character of the Debtor's indebtednesses to Robins from debts owed for commissions and management fees to debts to Robins for loans. This change is basically a distinction without a difference, except that the Debtor thereby received "expenses" which could be deducted from its tax liabilities. These gains in liabilities, like the tax benefits arising from the transfers themselves, appear to have added to, rather than detracting from, the assets of the Debtor.

A second conclusion which arises when these circular transactions are viewed as units is that the monies involved were not diverted from their availability to pay the

Debtor's other creditors. One of the primary purposes of § 548 of the Bankruptcy Code and § 357 of the UFCA is to prevent a debtor from transferring assets to certain specific creditors which should be available for all creditors. In the instant matter, it is unclear what assets, if any, the Debtor actually transferred. The evidence established that the monies involved originated from Robins.

Thus, while U & L argue that this court should view the transfers in issue in such a manner as to allow form to prevail over substance, it is precisely from such a viewpoint that this court regards each of the circular transactions as a whole. Accordingly, we find that the conveyances at issue are more properly analyzed when viewed as a series of events constituting single transfers than individual occurrences viewed in isolation. When viewed as such, they do not support the conclusion that the Debtor received inadequate consideration for its role in the transactions in issue.

Furthermore, since the transactions did not tend to deplete the Debtor's assets at all, it is impossible to conclude, on the basis of same, that these transactions, in themselves, contributed to the Debtor's insolvency, left the Debtor with unreasonably small capital, or rendered it unable to pay future debts as they fell due.

Since U & L failed to meet the second prong of the necessary elements for proving constructive fraud, we need not address the issue of insolvency or undercapitalization to determine that the transfers to the Goodways cannot be avoided as constructive frauds. We do observe, as we did in *LAF II, supra,* slip op. at *9, that the evidence of insolvency is equivocal. *See also* pages 679–81 *infra.* The change in this conclusion as a result of the Intervening District Court Order vacating the jury verdict in favor of the Debtor against Lauderhill does not, as Lauderhill suggests, wipe these claims from the face of the earth or significantly change our analysis in *LAF II.* These claims will be, if not resolved, retried, and a new jury could reach a decision even less palatable to Lauderhill than the prior verdict.

As we ruled in *Pinto Trucking Service, supra,* 93 B.R. at 388, whatever lack of clarity exists regarding the burden of proof as to insolvency once inadequate consideration for a transfer is proven, it is clear that U & L bore the burden of proving that the Debtor failed to receive adequate consideration in the challenged transfer transactions by the preponderance of the evidence. Since U & L have failed to prove this necessary element, their fraudulent conveyance claims against the Goodways must be dismissed.

### 4. APPLICABLE STATUTORY PROVISIONS FOR PREFERENTIAL TRANSFERS.

In addition to the claim that the monies paid by the Debtor to the Goodways were fraudulent conveyances, U & L allege that these transfers may also be avoided as preferential transfers pursuant to 11 U.S.C. § 547. This same provision of the Code serves as the sole basis for U & L's claims against GGM. In order to determine whether U & L is entitled to avoid the transfers made by the Debtor to any of the Affiliates, it is necessary to review the following applicable portions of 11 U.S.C. § 547:

(b) Except as provided in subsection (c) of this section, the trustee may avoid any transfer of an interest of the debtor in property—

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—

(A) on or within 90 days before the date of the filing of the petition or

(B) between ninety days and one year before the date of filing of the petition, if such creditor at the time of such transfer was insider; and

(5) that enables such creditor to receive more than such creditor would receive if—

(A) the case were a case under chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

(c) The trustee may not avoid under this section a transfer—

(1) to the extent that such transfer was—

(A) intended by the debtor and the creditor to or for whose benefit such transfer was made to be a contemporaneous exchange for new value given to the debtor; and

(B) in fact a substantially contemporaneous exchange;

(2) to the extent that such transfer was—

(A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;

(B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and

(C) made according to ordinary business terms;

. . . . .

(4) to or for the benefit of a creditor, to the extent that, after such transfer, such creditor gave new value to or for the benefit of the debtor—

(A) not secured by an otherwise unavoidable security interest; and

(B) on account of which new value the debtor did not make an otherwise unavoidable transfer to or for the benefit of such creditor; ...

Consequently, as stated in *LAF I, supra,* 141 B.R. at 859, resolution of a proceeding seeking to avoid a preference

requires a two-step analysis. First, each payment must be reviewed individually and a determination made whether it fulfills all of the requirements set forth in § 547(b). The court may determine a payment voidable only if *every* requirement set forth in § 547(b) is met. Sec-

ond, if a payment is deemed to be preference, then any defenses ... articulated under 11 U.S.C. § 547(c) to the payment must be addressed.

## 5. U & L HAS MET ITS BURDEN OF PROVING THAT THE REQUIREMENTS OF §§ 547(b)(3) and (b)(5) ARE SATISFIED, AND THE AFFILIATES' § 547(c)(2) DEFENSE CAN BE READILY REJECTED.

As stated above, U & L must establish all of the elements set forth in § 547(b) in order to prevail in its preference claims against the Affiliates. A review of the parties' post-trial briefs indicate that the elements of § 547(b) which appears to be in dispute are those set forth at pages 677–78 *supra, i.e.,* § 547(b)(2), (b)(3), (b)(5); and, as to the Goodways only, the element in the preamble to § 547(b) requiring that transfer "of an interest of the debtor in property" must be made. We will discuss the common §§ 547(b)(3) and (b)(5) issues at this time and leave the discussion of the other, more particularized § 547(b) issues to a later discussion of the defenses at pages 682 and 682–84 *infra.*

In an about-face of the positions from the parties from those taken in *LAF I, supra,* 141 B.R. at 860–61, U & L now claim, contrary to Lauderhill's position in *LAF I,* that the Debtor was insolvent not only within the 90-day non-insider-preference period, but for the duration of the one-year insider-preference period. Contrary to the testimony of witnesses under their control in *LAF I,* the Affiliates now contend that the Debtor was solvent at the time of at least some of the transfers in issue. In support of their argument, the Affiliates rely upon the documents and testimony of Tennant, which supports the position that LAF was solvent at the time of at least the earlier of the challenged transfers. In addition, they dispute Miller's assertion that the Debtor was, at all times within the one-year period and considerably prior thereto, insolvent, and they contend that Miller's opinion was based upon inaccurate information.

The Affiliates fail in their argument that LAF was solvent during the one-year insider preference period. We begin by noting that this court has previously addressed the issue of the Debtor's solvency during the 90–day time period preceding its bankruptcy in *LAF I, supra*, 141 B.R. at 860–61. Contrary to Lauderhill's position at that time, we concluded that "it is clear that the Debtor was in fact insolvent at all pertinent times." As we noted at page 669 *supra*, we are extremely disinclined to alter any determinations which we made in *LAF I*, especially now that the positions of the parties as to these issues has reversed. Consequently, we easily conclude that U & L have met their burden of proving that the Debtor was insolvent in connection with any of the alleged preferential transfers which occurred in the 90 days preceding LAF's bankruptcy filing.

 Secondly, the Affiliates failed to present any convincing evidence to counter U & L's proof that the Debtor was insolvent during the remaining time periods at issue. While the Affiliates were not obliged to rebut any presumption of insolvency outside of the 90–day general preference period, *see In re Old World Cone Company*, 119 B.R. 473, 476–77 (Bankr. E.D.Pa.1990), logic dictates that they were required to offer at least some evidence of a change in circumstances between the beginning of the one-year period and the commencement of the 90–day period. However, we note that Tennant, the Affiliates' own expert witness, as well as Miller, did not vigorously dispute the assertion that the Debtor was insolvent from at least the end of 1990. As we noted at page 671 *supra*, Miller advocated the use of a strict GAAP approach in rendering his insolvency analysis. Tennant, meanwhile, utilized the "net realizable value" approach, *i.e.*, measuring the Debtor's assets by estimating their sale value at a given point in time.

 Courts are not required to rely upon GAAP standards when determining the issue of insolvency. *See In re Sierra Steel, Inc.*, 96 B.R. 275, 278 (Bankr. 9th Cir.1989) (although GAAP principles are relevant, they are not controlling in making a bankruptcy insolvency determination); *In re Richmond Produce Co., Inc.*, 151 B.R. 1012, 1019 (Bankr.N.D.Cal.1993) (GAAP principles do not control the determination of insolvency). *See also Thor Power Tool Co. v. Commissioner*, 439 U.S. 522, 544, 99 S.Ct. 773, 787, 58 L.Ed.2d 785 (1979) (GAAP principles themselves tolerate a range of treatment of certain transactions, leaving a choice of alternatives approaches).

In the instant matter, the court is therefore not bound to accept the computations based largely on GAAP principles offered by Miller. We also note that, in *In re Joshua Slocum, Ltd.*, 103 B.R. 610, 621–22 (Bankr.E.D.Pa.), *aff'd*, 121 B.R. 442 (E.D.Pa.1989), this court utilized an approach very close to that advocated by Tennant, *i.e.*, we engaged in a "balance sheet" analysis of the debtor's financial status based, in part, upon the value of the debtor's assets.

We therefore conclude that Tennant's general analytical approach is preferable than that of Miller. However, we do not agree with all of Tennant's assumptions in applying his approach to the facts in issue here.

Our review of the instant Debtor's financial condition begins with its own monthly balance sheets for the disputed period in issue, *i.e.*, from May 30, 1990, through the end of 1990. These reports indicate that the Debtor's assets exceeded its liabilities and hence that it was solvent during the pertinent period. However, both Miller and Tennant agree that the Debtor's records failed to include certain items which affect its solvency, and the balance sheets must be adjusted accordingly. Weighing the testimony of both Miller and Tennant, we believe that the following adjustments are appropriate:

(1) Accounts receivable should be reduced by ten (10%) percent to reflect uncollectible accounts;

(2) Cars & equipment should be reduced by ten (10%) percent to reflect depreciation in value;

(3) Accounts payable should be increased to reflect the amounts the Debtor was

billed and admitted it owed to Lauderhill. However, these amounts should be reduced by about twenty-five (25%) percent to account for the Debtor's disputes of the amounts owed which are currently being litigated in the district court; and

(4) The debt owed by the Debtor to GAS should be eliminated, since that company no longer exists.

When making these adjustments to the Debtor's balance sheets, we conclude that the Debtor was insolvent for the entire period between June, 1990, and November, 1990.[5]

The Affiliates also fail in their argument that U & L did not prove the § 547(b)(5) element that the Affiliates received more monies from the Debtor than they would have received under a Chapter 7 liqui-

5. Our precise calculations for June, 1990, and November, 1990, are as follows. No changes in the Debtor's insolvency status during this period are suggested.

JUNE, 1990

ASSETS

| | HISTORICAL COST | ADJUSTMENT | COURT ASSESSED VALUE |
|---|---|---|---|
| Cash | $ (69,356) | — | $ (69,356) |
| Accounts Receivable | 2,386,826 | | |
| 10% reduction | | ($238,862) | 2,148,144 |
| Car & Equipment | 482,761 | | |
| 10% Adjustment | | ($ 48,276) | 434,485 |
| Due from Goodway | 243,600 | ($243,600) | –0– |
| Other Assets | 24,250 | — | 24,250 |
| TOTAL ASSETS | $3,068,081 | ($530,558) | $2,537,523 |

LIABILITIES

| | HISTORICAL COST | ADJUSTMENT | COURT ASSESSED VALUE |
|---|---|---|---|
| Lines of Credit | $1,100,000 | — | $1,100,000 |
| Notes Payable | 366,167 | — | 366,167 |
| Accounts Payable | 163,528 | | |
| Adjustments for unreported Accounts Payable to Lauderhill | | 234,611 | 398,149 |
| 25% Reduction | | ( 99,537) | ( 99,537) |
| Accrued Expenses | 122,122 | — | 122,122 |
| Other Liabilities | 139,334 | — | 139,334 |
| Due to Affiliates | 1,153,168 | — | 1,153,168 |
| Management Fees | — | 0 | 0 |
| Lindo's Commission | | 0 | 0 |
| Total Liabilities | $3,044,329 | $ 134,074 | $3,179,403 |

SUMMARY

| | |
|---|---|
| TOTAL ASSETS | $2,537,523 |
| TOTAL LIABILITIES | 3,179,403 |
| NET EQUITY (DEFICIT) | ($ 641,880) |

dation. The Affiliates assert that, in such a liquidation, they would receive as much as they did as a result of their payments because the Debtor's assets will be swelled by the jury findings in the District Court trial against Lauderhill and the $850,055.33 judgment entered in the Debtor's favor against Lauderhill by this court in *LAF I*.

■ These arguments of the Affiliates are totally unpersuasive. They ignore the fact that the jury findings in the District Court litigation in favor of the Debtor were subsequently set aside by the district court, rendering their positive effect upon the Debtor's solvency questionable.

We note that similar arguments (that potential recoveries should be considered in the insolvency analysis) were advanced by Lauderhill and rejected by this court in *LAF I, supra*, 141 B.R. at 860. In response, we stated therein: "It is only if and when the debtor-in-possession *recovers* property ... that property becomes property of the Debtor's estate." *Id.*

We already found that the § 547(b)(5) element was proven in *LAF I*, 141 B.R. at 860–61. Since we find that the Debtor was insolvent at all pertinent times, it is clear that it would not have been able to pay all of its creditors in full if this case had been filed under Chapter 7. Therefore, that requirement is rather easily found evident on this record.

■ The only elements of § 547(c)(2) which are in issue, are, again, those set forth at page 678 *supra, i.e.*, those set forth in §§ 547(c)(1), (c)(2), and (c)(4). Again, initially considering the issues common to all of the Affiliates, we first address futile defenses under 11 U.S.C. § 547(c)(2) argued by the Affiliates. In this regard, the Affiliates contend that (1) the series of transactions where monies were paid by the Debtor to the Goodways

NOVEMBER, 1990

### ASSETS

| | HISTORICAL COST | ADJUSTMENT | COURT ASSESSED VALUE |
|---|---|---|---|
| Cash | $ 88,445 | — | R 88,445 |
| Accounts Receivable | 3,042,889 | | |
| 10% Reduction | | ($304,289) | 2,738,600 |
| Cars & Equipment | 466,699 | | |
| 10% Adjustment | | ($ 46,670) | 420,029 |
| Due from Goodway | 243,600 | ($243,600) | — |
| Other Assets | 24,600 | — | 24,600 |
| TOTAL ASSETS | $3,866,233 | ($594,557) | $3,271,676 |

### LIABILITIES

| | | | |
|---|---|---|---|
| Lines of Credit | $1,060,000 | — | $1,060,000 |
| Notes Payable | 366,167 | — | 366,167 |
| Accounts Payable | 878,538 | | |
| Adjustments for unreported Accounts Payable to Lauderhill | | 105,105 | 983,643 |
| 25% Reduction | | (245,910) | (245,910) |
| Accrued Expenses | 150,173 | — | 150,173 |
| Other Liabilities | 115,108 | — | 115,100 |
| Due to Affiliates | 1,225,344 | — | 1,225,344 |
| Total Liabilities | $3,795,330 | ($ 78,024) | $3,653,974 |

### SUMMARY

| | |
|---|---|
| TOTAL ASSETS | $3,271,674 |
| TOTAL LIABILITIES | 3,653,974 |
| NET EQUITY (DEFICIT) | ($ 832,300) |

and Robins, in turn, paid over the same or approximately the same sum to the Debtor; and (2) the series of payments back and forth between the Debtor and GGM, can both be characterized as having been made in the ordinary course of business between these parties. While the Affiliates may have proven that this course of conduct was common between the respective parties, they failed to prove or even allege the presence of one of the other necessary elements of a § 547(c)(2) defense: that such transactions are ordinary in the car-rental industry in general. *See, e.g., In re Fred Hawes Organization, Inc.,* 957 F.2d 239 (6th Cir.1992); *In re Molded Acoustical Products, Inc.,* 150 B.R. 608, 615 (E.D.Pa.1993); and *LAF I, supra,* 141 B.R. at 863–64. Such rather obviously extraordinary transactions seem improbable candidates for being deemed common in *any* industry. Therefore, patently, no viable § 547(c)(2) defenses have been established by any of the Affiliates.

### 6. THE GOODWAYS HAVE SEVERAL VALID DEFENSES TO THE PREFERENCE CLAIMS AGAINST THEM IN LIGHT OF THE FACT THAT NO ACTUAL "TRANSFERS" FROM THEM TOOK PLACE.

Our discussion and findings regarding the unsuccessful constructive fraudulent conveyance claims of U & L against the Goodways portends the valid defenses which these parties do have to the preference claims against them. Therein, at pages 675–77 *supra,* we indicated our acceptance of the Goodways' argument that each of the transfers must be viewed as a part of a series of transactions in which the sums transferred to the Goodways came back to the Debtor again via payments from Robins.

On several theoretical bases, such transactions do not constitute avoidable preferential transfers. Firstly, it does not appear that these transactions were transfers at all. The Debtor, by arrangement with the Goodways and Robins, simply received back from Robins exactly what it gave to the Goodways.

Secondly, if these transactions could be classified as transfers, it is impossible to classify them as "transfers of an interest of the debtor in property." The Debtor lost no interest in property in these transactions. It received back from Robins, by design of the parties, exactly what it paid out to the Goodways. The reason why such transactions are not preferences is similar to the reasoning supporting the so-called "earmarking doctrine," *see New York City Shoes, Inc. v. Best Shoe Corp.,* 106 B.R. 58, 60 (E.D.Pa.1989); *In re Kelton Motors, Inc.,* 153 B.R. 417, 423, 24 B.C.D. 190, 193–96 (Bankr.D.Vt.1993); and M. Pappone & T. Orson, *The Logic—and the Limits—of the Earmarking Defense,* 2 FAULKNER & GRAY'S BANKR.L.REV. 27, 28–29 (Spring 1990), *i.e.,* the transfer goes directly from a third party to the creditor on behalf of the Debtor and hence the Debtor's estate is not diminished by the transfer. In the instant scenarios, the "transfers" went directly from the Debtor to the transferee, from the transferee to a third party, and then back to the Debtor again. Consequently, the Debtor's estate was in no sense diminished by these "transfers."

The instant facts lend themselves to an affirmative defense to avoidance of these transactions as preferential transfers as well. Under 11 U.S.C. § 547(c)(1), a transfer is not avoidable to the extent that it was intended to be made in exchange for a contemporaneous exchange of new value and was in fact a contemporaneous exchange. *See In re Spada,* 903 F.2d 971, 975 (3rd Cir.1990); and *In re Samar Fashions, Inc.,* 109 B.R. 136, 139 (Bankr. E.D.Pa.1990). In the instant scenarios, the Debtor made the "transfers" to the Goodways with the intention of receiving payments from Robins in the same or nearly the same amounts within a short time thereafter. Payments were in fact received by the Debtor from Robins within a very short timespan after the Debtor's initial transfers. Assuming *arguendo* that the Debtor made transfers to the Goodways at all, such "transfers" are subject to § 547(c)(1) defenses.

Therefore, we conclude that the payments which the Debtor made to the Goodways are not avoidable, either as fraudulent conveyances *or* as preferential transfers.

### 7. THE DEBTOR'S PAYMENTS TO GGM ARE PARTIALLY SUBJECT TO §§ 547(c)(1) (AS TO ONE TRANSFER) AND (c)(4) DEFENSES (EXCEPT AS TO $173,000 OF THE SUMS TRANSFERRED).

GGM presents an array of defenses to the claims of preferential transfers raised against it by U & L. Some of these are, to at least some degree, meritorious. In addition to the defenses that the elements of §§ 547(b)(3), (b)(5) were not proven and that it has proven the element of § 547(c)(2), which we unqualifiedly rejected at pages 678–82 *supra*, GGM argues that (1) U & L failed to prove the element of § 547(b)(2) as to all of the transfers to it; (2) § 547(c)(1) establishes a defense as to the transfer of June 6, 1990, which represented a repayment of a $200,000 loan which GGM allowed it to make on GGM's own account with National Westminster Bank ("Nat West") and repay immediately to Nat West; and (3) new value provided to the Debtor by GGM nearly equals the payments made to GGM by the Debtor.

With respect to § 547(b)(2), GGM argues, in its Brief, that the failure of Miller to testify as to this element is fatal to U & L's preference claim. However, it is not clear why Miller would be expected to testify as to such matters. The scope of his testimony was focused on establishing the Debtor's insolvency at the critical times of the transfers in issue. Therefore, this contention of GGM is puzzling and appears meritless.

U & L point out, in their post-trial submission, that GGM presented an Exhibit (D–13) which is captioned "GGM Co. Loans to LAF," which strongly suggests an acknowledgement by the Debtor that GGM and the Debtor had a creditor-debtor relationship. Also, U & L point out that, in responses to pre-trial Interrogatories admitted into the record as Exhibit L–73, GGM stated that it "believes at this time that the debts paid [to GGM] were antecedent debts."

The payments made by the Debtor to GGM were clearly not like the "circle of cash" payments to the Goodways. Payments by the Debtor to GGM were *not* followed by remittances by either GGM or any other party back to the Debtor in equal or almost equal amounts. All indicators, including the testimony of both Steven and Donald, were to the effect that the Debtor and GGM had a conventional debtor-creditor relationship. The Debtor borrowed from GGM in times of need, particularly when monthly lease payments were due from the Debtor to Lauderhill, and the Debtor repaid GGM when and if it could. Every indication supports the conclusion that the Debtor's payments to GGM were on account of antecedent debts owed to GGM.

GGM also appears to contend that an argument that the element provided in § 547(b)(2) is lacking arises from its contention that certain of the sums paid to it by the Debtor were not on account of an antecedent debt because the Debtor had no debt to GGM at the time of these payments. Specifically, GGM asserts that if the monies paid to GGM by the Debtor are reduced by monies subsequently paid to the Debtor by GGM, then a portion of the Debtor's transfer to GGM on February 22, 1991, and the payments on March 5, 1991, and March 27, 1991, were not payments on antecedent debts, since payments by the Debtor to GGM exceed the amount of monies that GGM had loaned to the Debtor at that time.

However, we find that GGM is incorrect in its claim that the sums paid to it on the three dates listed above were not on account of antecedent debts. The calculations relied upon by GGM arise in connection with its new value (§ 547(c)(4)) defense. A review of the court's calculation at pages 685–87 *infra*, indicates that, when the Debtor made each of the payments to GGM, they were preceded by antecedent debts.

We therefore conclude that the Debtor has admitted, in the aforementioned exhibits, the presence of the element set forth in § 547(b)(2). Even if it had not made that admission, we believe that our calculations support the conclusion that the § 547(b)(2) element was present.

The next Code section which we must consider is § 547(c)(1), the pertinent aspects of which we previously discussed at pages 682–83 *supra*.

GGM argues that the single payment made by the Debtor to Nat West on behalf of GGM on June 6, 1990, may be defended on this basis. The unrebutted evidence presented by GGM indeed shows that the Debtor, GGM, and Nat West all intended that this transaction constitute a loan in which the sums were advanced to the Debtor by Nat West, GGM's bank, on a short term basis, with the Debtor to tender almost immediate repayment to Nat West. The Debtor did in fact make the re-payment to Nat West on the next day. These facts establish that this particular transfer fulfills the "contemporaneous exchange" requirement of § 547(c)(1). Consequently, this payment may not be avoided by U & L.

Finally, GGM asserts a defense to most, if not all, of the preferential payments in issue based upon § 547(c)(4), the "new value" defense. As was stated by this court in *LAF I, supra,* 141 B.R. at 864, quoting *In re New York City Shoes, Inc.,* 880 F.2d 679, 680 (3rd Cir.1989),

"[t]he three requirements of section 547(c)(4) are well established. First, the creditor must have received a transfer that is otherwise voidable as a preference under § 547(b). Second, *after,* receiving the preferential transfer, the preferred creditor must advance 'new value' to the debtor on an unsecured basis. Third, the debtor must not have fully compensated the creditor for the 'new value' as of the date that it filed its bankruptcy petition."

The evidence indicates that, after receiving the alleged preferential transfers in issue, GGM provided additional monetary advances to the Debtor. In fact, U & L, in the modest portion of its lengthy Brief devoted to their claims against GGM, concedes that the net preference received could not be more than half of the Debtor's advances of over $1.3 million to GGM during the one-year insider preference period.

While GGM is therefore clearly entitled to assert a new value defense as to some of the payments which it received from the Debtor, we find that it cannot successfully assert this defense, as it argues, as to the funds which GGM paid to the Debtor post-petition, nor as to the payments made by Donald under the letter of credit drawn against the Debtor by Meridian. Firstly, GGM cannot, as a matter of law, utilize post-petition advances to the Debtor to offset pre-petition preferential transfers. *See In re Bellanca Aircraft Corp.,* 850 F.2d 1275, 1284–85 (8th Cir. 1988) (subsequent advances of new value are only those given pre-petition because any post-petition advances are given to the debtor's *estate,* not to the debtor). *Accord, In re American Int'l Airways, Inc.,* 68 B.R. 326, 337 (Bankr.E.D.Pa.1986), *aff'd,* C.A. No. 87–1287, 1987 WL 54484 (E.D.Pa. May 12, 1987).

Secondly, the position advanced by GGM regarding the application of the sums remitted on the calling of Meridian's letter of credit is contrary to the position taken by Donald and the Debtor, and the court's determination, in *LAF I,* 141 B.R. at 865–67. In the context of *LAF I,* Donald testified that the letter of credit was the sole obligation and debt of the Debtor, and that his only involvement was to allow the use of his name to facilitate the issuance of the letter of credit. Based upon this and other factors, we concluded that the payment on the letter of credit was properly included as a payment of the Debtor to Lauderhill in the calculations of the Debtor's claims to recovery of preferential transfers from Lauderhill. Donald now contends that the advance on the letter of credit was his personal obligation on behalf of the Debtor, and should be deducted from the payments to the Debtor to GGM, of which he is a co-partner, as "new value" advanced by GGM. Putting aside the issues of whether either

GGM, as a partnership entity, or Beryl as a co-partner of it, could assert Donald's personal payment as new value, we conclude that our decision-making process in *LAF I* precludes our considering the payment on the letter of credit as anything but a payment by the Debtor. Hence, the letter of credit payments will not be deducted from the transfers to the Debtor to GGM as an aspect of a "new value" defense.

8. CALCULATION OF THE AMOUNT OF THE PREFERENTIAL PAYMENTS RECOVERABLE FROM GGM.

We therefore conclude that the Goodways are not liable to the Debtor on either fraudulent conveyance or preferential transfer claims against it. However, as to GGM, despite its success in asserting a § 547(c)(1) defense as to the Nat West payment and a § 547(c)(4) defense as to a substantial portion of the other payments made by the Debtor on GGM's behalf, some avoidable preferential payments remain.

In calculating the avoidability and amount of the transfers at issue, particularly in a series of payments as to which a § 547(c)(4) defense is asserted, this court, again in the interests of fair play and consistency to parties on both sides, will utilize the same approach that it employed in *LAF I*, 141 B.R. at 867–68. We will determine the total of the payments made, including each particular allegedly preferential payment, from the date of that payment through the date of the bankruptcy filing on May 30, 1991. We will then subtract from the total of payments made, from that date forward, the total new value supplied, from the date of each particular transfer through May 30, 1991. The resulting calculations are as follows:

1. $200,000 (June 6, 1990) (Nat West payment) (§ 547(c)(1) defense eliminates from consideration)

2. $200,000 (June 12, 1990)

| | | |
|---|---|---|
| Payments | $1,275,000 | |
| New Value | 1,102,000 | |
| Net Preference | $173,000 | |
| Amount Voidable | | $173,000 |

3. $ 35,000 (August 3, 1990)

| | | |
|---|---|---|
| Payments | $1,075,000 | |
| New Value | 1,102,000 | |
| Net Preference | ($ 27,000) | |
| Amount Voidable | | $ –0– |

4. $118,000 (September 5, 1990)

| | | |
|---|---|---|
| Payments | $1,040,000 | |
| New Value | 867,000 | |
| Net Preference | $173,000 | |
| Amount Voidable | | $118,000 |

5. $ 38,000 (September 6, 1990)

| | | |
|---|---|---|
| Payments | $ 922,000 | |
| New Value | 867,000 | |
| Net Preference | $ 55,000 | |
| Amount Voidable | | $ 38,000 |

6. $ 44,000 (September 14, 1990)

| | | |
|---|---|---|
| Payments | $ 884,000 | |
| New Value | 867,000 | |
| Net Preference | $ 17,000 | |
| Amount Voidable | | $ 17,000 |

7. $100,000 (November 30, 1990)

| | | |
|---|---|---|
| Payments | $ 840,000 | |
| New Value | 717,000 | |
| Net Preference | $123,000 | |
| Amount Voidable | | $100,000 |

8. $ 50,000 (December 4, 1990)
 Payments $ 740,000
 New Value 717,000
 Net Preference $ 23,000
 Amount Voidable $ 23,000
9. $ 55,000 (December 11, 1990)
 Payments $ 690,000
 New Value 687,000
 Net Preference $ 3,000
 Amount Voidable $ 3,000
10. $ 25,000 (January 4, 1991)
 Payments $ 635,000
 New Value 600,000
 Net Preference $ 35,000
 Amount Voidable $ 25,000
11. $ 20,000 (January 14, 1991)
 Payments $ 610,000
 New Value 380,000
 Net Preference $230,000
 Amount Voidable $ 20,000
12. $ 20,000 (January 17, 1991)
 Payments $ 590,000
 New Value 380,000
 Net Preference $210,000
 Amount Voidable $ 20,000
13. $ 25,000 (January 24, 1991)
 Payments $ 570,000
 New Value 380,000
 Net Preference $190,000
 Amount Voidable $ 25,000
14. $ 20,000 (February 1, 1991)
 Payments $ 545,000
 New Value 380,000
 Net Preference $165,000
 Amount Voidable $ 20,000
15. $110,000 (February 4, 1991)
 Payments $ 525,000
 New Value 380,000
 Net Preference $145,000
 Amount Voidable $110,000
16. $ 25,000 (February 7, 1991)
 Payments $ 415,000
 New Value 380,000
 Net Preference $ 35,000
 Amount Voidable $ 25,000
17. $ 20,000 (February 8, 1991)
 Payments $ 390,000
 New Value 380,000
 Net Preference $ 10,000
 Amount Voidable $ 10,000
18. $ 30,000 (February 21, 1991)
 Payments $ 370,000
 New Value 380,000
 Net Preference ($ 10,000)
 Amount Voidable $ -0-
19. $ 60,000 (February 22, 1991)
 Payments $ 340,000
 New Value 380,000
 Net Preference ($ 40,000)
 Amount Voidable $ -0-

20. $ 60,000 (March 5, 1991)

| | | |
|---|---|---|
| Payments | $ 280,000 | |
| New Value | 380,000 | |
| Net Preference | ($ 100,000) | |
| Amount Voidable | | $ –0– |

21. $220,000 (March 19, 1991)

| | | |
|---|---|---|
| Payments | $ 220,000 | |
| New Value | 380,000 | |
| Net Preference | (160,000) | |
| Amount Voidable | | $ –0– |

We will establish the amount due as a result of these calculations by applying, once again, our following reasoning set forth in *LAF I*, 141 B.R. at 868:

> The Debtor's counsel agreed that the debtor was not entitled to recover the cumulative effect of all of the preferential payments. We agree that it would be grossly inequitable, counterintuitive, and contrary to the purposes served by § 547(c)(4) to so rule. If all of the transfers could be avoided, the result would be that, despite having received new value of $4,325,826.25 over the entire pertinent post-transfer period from Lauderhill and having paid only $5,269,748.97 during this period, the Debtor would recover the sum of the amounts avoidable in all nine transactions, which would equal almost $3.7 million.
>
> Rather, we believe that we must assume that, if a judgment is entered against Lauderhill as to any particular transfer, this sum would be paid to the Debtor. Lauderhill should then receive credit for payment of that amount against any other avoidable transfer in this series. Consequently, we conclude that the Debtor should rightfully recover a judgment for only the largest of the avoidable transfers.

Applying the above reasoning, we readily observe that the largest amount recoverable as a result of our analysis of the avoidable transfers in issue is $173,000, resulting from the calculations pertinent to the second transfer from the Debtor to GGM on June 12, 1990. We will enter a judgment in favor of U & L in this amount.

## D. CONCLUSION

An Order entering judgment in favor of U & L, on behalf of the Debtor, in the amount of $173,000 from GGM will be entered in this proceeding. All other claims of U & L against any of the Affiliates will be dismissed.

## ORDER

AND NOW, this 17th day of June, 1993, upon consideration of the record made at the consolidated trial of the above proceedings on March 25, 1993, March 29, 1993, March 30, 1993, and March 31, 1993, and of the post-trial Briefs submitted by the parties, it is hereby ORDERED AND DECREED as follows:

1. In Adv. Nos. 92–1071 and 92–1072, judgment is entered in favor of the respective Defendants, GOODWAY GRAPHICS OF VIRGINIA, INC. and GOODWAY GRAPHICS OF MASSACHUSETTS, INC., and against the Plaintiffs, MORSE OPERATIONS, INC. d/b/a LAUDERHILL LEASING and UNIVERSITY CADILLAC, INC., on behalf of LEASE–A–FLEET, INC. The Complaints in these proceedings are therefore DISMISSED.

2. In Adv. No. 92–1103, judgment is entered in favor of the Plaintiffs, MORSE OPERATIONS, INC. d/b/a LAUDERHILL and UNIVERSITY CADILLAC, INC. on behalf of LEASE–A–FLEET, INC., and against the Defendants, DONALD WOLK and BERYL WOLK t/a GGM Co., in the amount of $173,000. The Defendants are directed to pay this sum to the Debtor, LEASE–A–FLEET, INC.

3. The Motion of the Plaintiffs to strike certain portions of the Defendants' Brief is DENIED as moot, since this court was not inclined to consider the disputed materials in rendering this decision in any event.